ERIE TELECOMMUNICATIONS, INC.,
a Pennsylvania Corporation, Plaintiff,

v.

CITY OF ERIE, a Pennsylvania
Municipal Corporation,
Defendant.

Civ. A. No. 85–185 Erie.

United States District Court,
W.D. Pennsylvania.

April 15, 1987.

David J. Saylor, Robert L. Corn, Hogan & Hartson, Washington, D.C., James D. McDonald, Jr., Gary Eiben, Erie, Pa., for plaintiff.

T. Warren Jones, Dale E. Huntley, MacDonald Illig Jones & Britton, James R. Walczak, Erie, Pa., for defendant.

## OPINION

MENCER, District Judge.

This suit involves a challenge to the validity of a cable franchise agreement entered into between plaintiff Erie Telecommunications, Inc. ("ETI") and defendant City of Erie. ETI attacks certain provisions of the agreement as being violative of the first and fourteenth amendments of the U.S. Constitution and seeks redress for these alleged constitutional infringements through the application of 42 U.S.C. § 1983.[1] Additionally, ETI maintains that the agreement contains certain fee provisions which contravene federal statutory authority. Based upon this position, ETI has ceased making payments due to the City of Erie under the franchise agreement. Conversely, the City, assured of the propriety of the agreement, presents a counterclaim seeking damages for ETI's breach of contract. Instantly, before this Court, are the City's motion for partial summary judgment with respect to all counts of ETI's complaint and ETI's own crossmotion for summary judgment.[2]

After review of this record, the Court concludes that as a matter of law, the instant undisputed facts warrant a grant of partial summary judgment in favor of defendant City of Erie.

1. In its disposition of this case, the Court will not address those claims which arise under Pennsylvania Constitution. *See supra* at footnote 37.

2. The City of Erie asserts two distinct counterclaims sounding in tort. Because it does not presently request summary judgment on these counterclaims, the City seeks only a grant of partial relief.

## I. FACTUAL BACKGROUND

In May 1980, in an effort to generate revenue, the City of Erie issued a Request For Proposals for the award of a cable television franchise. The proposal outlined the terms that would be requested of potential cable operators. The ordinance provided that the grantee pay the City an annual franchise fee equal to five percent of the operator's gross annual receipts, with a minimum payment of $100,000 per year. It also stated that the cable operator would be expected to purchase municipal bonds issued by the City, in the amount of $1 million as a security fund and another $1 million construction bond, and to pay the City $100,000 to cover franchising process expenses. Further, the ordinance noted that a "Side Agreement" would mandate that the grantee provide and support local "access" programming.[3] Support for the programming included access fees of $120,000 upon the award of the franchise, $240,000 thereafter in monthly installments of $10,000, followed by monthly payments based upon a percentage of gross receipts.

In August 1980, public hearings were held at which each of six applicants offered proposals for the awarding of the franchise. Plaintiff ETI, whose principal shareholder American Television and Communications Corporation is the nation's second largest cable systems operator, was one of those applicants. On October 22, 1980, after negotiations had fallen through with another applicant, Erie Comcast Cablevision, Erie City Council voted to negotiate simultaneously with ETI and Teleprompter of Erie, Inc. On October 29, 1980, council decided that ETI would be awarded the city's cable television franchise.[4] The City

3. "Access" programming refers to the local origination of programming by local individuals or groups, principally for public, educational or governmental purposes.

4. In January 1981, Teleprompter brought suit against ETI and the City, challenging the validity of the franchise selection process. The litigation was settled on January 24, 1984 by Judge Weber's entry of a Consent Order and the execution of a "Mutual Release and Covenants" by

of Erie and ETI executed a cable franchise agreement on November 11, 1980 for an initial term ending December 31, 1990.[5]

The final negotiated franchise agreement details various prepayments and future fees. Section 29(A) of the agreement provides:

As compensation for permission to use the streets and public ways of the City for the construction, operation, maintenance, modification, and reconstruction of a Cable System, and for the City's costs in establishing a regulatory program for Grantee (ETI), the Grantee shall pay to the City an annual amount equal to five percent (5%) of the Grantee's Gross Annual Receipts, until disapproved by the FCC.[6]

The agreement provides for the satisfaction of this 5% assessment through two distinct means. Under § 29(D)(1), prepayment of those fees required under § 29(A) was due in the amount of $2,700,000. Further, under § 29(D)(2), a minimum of $100,000 per year or the 5% assessment, whichever was greater, is due for each year the agreement covers. However, no payment greater than $100,000 was due until all prepaid franchise fees had been recovered by ETI. Moreover, a $150,000 fee was imposed for direct and indirect expenses incurred by the City in the franchising process and an additional $150,000 fee became due as compensation for the City's aid in securing space for ETI's cables on existing utility poles.

The franchise and side agreements also specify certain access requirements. Under the franchise agreement, "in-kind" requirements of dedicated channel capacity and television production equipment and training are imposed on ETI. The side agreement outlines the fee structure for the maintenance of access channels. Essentially, the agreement demands of ETI a prepayment of $30,000, followed by payments of $90,000 during the remainder of the first year of the franchise term, $10,000 per month for years one through three, and $25,000 per year until expiration of the franchise agreement. Additionally, subject to certain exceptions and after recovery of the prepaid franchise fees, the side agreement requires ETI to pay 1% of its gross receipts for access programming use.

Aside from the ETI's various prepayments, ETI maintains that from November 1980 until the initiation of the instant suit, $540,000 in franchise and access support payments have been made. Since April 1985, ETI has refused to honor the fee provisions of the franchise agreement.

## II. AFFIRMATIVE DEFENSES

Initially, before addressing the merits of ETI's claims, the Court must determine the validity of the City's three affirmative defenses. First, by virtue of its conduct in securing the cable franchise, the City argues that ETI has waived or must be estopped from challenging the legality and enforceability of the franchise agreement. Second, the City maintains that the legal position taken by ETI in the case of *Teleprompter of Erie, Inc. v. City of Erie*, an action challenging the propriety of the franchise bidding procedure, should bar ETI from asserting that the franchise agreement is invalid or unenforceable. Finally, the City asserts that ETI's claims for damages under 42 U.S.C. § 1983 are barred by the applicable statute of limitation. These contentions will be addressed *seriatim*.

---

Teleprompter, Westinghouse Electric Company (Teleprompter's parent company), ETI, American Television and Communications Corporation, and the City of Erie.

5. Section 5 of the November 11, 1980 agreement provides that ETI's franchise rights are not exclusive. In accord with this provision, in August 1983, Erie City Council authorized the city's cable communications officer to advertise for a second cable franchise. The record reveals no indication that any applicant ever submitted a proposal.

6. When the Erie cable franchise was awarded on November 11, 1980, and until the effective date of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521–611 on December 29, 1984, Federal Communications Commission regulations limited franchise fees to three percent of gross revenues.

## A. Waiver or Quasi-Estoppel by Virtue of the Franchise Agreement

### 1. ETI's Constitutional Claims

In support of its motion for partial summary judgment, the City advances an argument based on quasi-estoppel. According to the City, ETI not only proposed the contractual terms that it is presently challenging, but also received substantial benefit from the franchise agreement. Maintaining that it has relied to its detriment on ETI's conduct, the City argues that to permit ETI to benefit from its recent change in position would be unconscionable.

ETI does not directly address the City's estoppel argument, but instead responds to the City's motion by asserting that it has not waived its right to challenge the constitutionality of the fee agreement. ETI contends that the condition precedent to waiver of a constitutional right—voluntary relinquishment of a known right—has not been satisfied. Additionally, ETI suggests that strong public policy considerations preclude the application of the doctrine of waiver.[7] The Court concludes that ETI's entering into the franchise agreement neither constitutes a waiver of nor a ground for estopping the assertion of the instant constitutional claims.

### a. Waiver

The seminal case in the area of waiver of first amendment rights is *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In that case the United States Supreme Court focused on the defendant publishing company's knowledge of available constitutional defenses. Finding that the specific issue in the case had not been clearly resolved prior to *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court refused to conclude that *Curtis* had knowledge of its constitutional rights. In rejecting the waiver argument the Court held that

> the constitutional protection which *Butts* contends that *Curtis* has waived safeguards a freedom which is the 'matrix, the indispensable condition, of nearly every other form of freedom....' Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling.

*Curtis*, 388 U.S. at 145, 87 S.Ct. at 1986, 18 L.Ed.2d at 1105, *citing Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 293 (1937).

The standard set forth by the Supreme Court in *Curtis* offers broad protection against the waiver of first amendment rights. Plainly, the granting of a waiver defense hinges on a party's knowledge of the existence of first amendment rights. The Court's holding clearly rejected the fifth circuit's admonition that a party should be charged with reading "the handwriting on the wall." *Curtis*, 388 U.S. at 143–44, 87 S.Ct. at 1985, 18 L.Ed.2d at 1104.

Thus, in reviewing the waiver issue this Court must consider whether, in 1980, the law would have recognized a cable company's first amendment challenge to an assertion of excessive franchise fees. In evaluating this issue, the Court is cognizant of the expansion of rights the cable companies experienced in the late 1970s. *See, e.g., FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (*Midwest Video II*).[8] It is unclear,

---

**7.** ETI also argues that it has expressly or impliedly reserved the right to challenge the constitutionality of the franchise fees. In this regard, ETI directs the Court to §§ 6(F), 18(I), 19(A) and 19(B) of the franchise agreement. Concluding that there has been no waiver, the Court finds it is unnecessary to address ETI's final assertion.

**8.** In a 5–4 decision, the Supreme Court in *Midwest Video II*, affirmed an Eighth Circuit decision striking down the FCC's access channel regulation. In contrast to the Court's decision in *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (*Midwest Video I*), in which the Court upheld the FCC's cablecasting regulation, in *Midwest Video II*, the Court held that the access channel regulation went beyond what was reasonably necessary to further long established FCC objectives. *Midwest Video II* was significant because it was the first time the Supreme Court cut back on the FCC's expansive authority to regulate the cable industry. *See Midwest Video I*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *United States*

however, what affect that expansion had on cable operators' first amendment rights in general and the franchise fee issue in particular.[9] Therefore, in light of the ambiguity and uncertainty in 1980, surrounding the first amendment rights of cable companies, this Court cannot conclude that ETI waived its first amendment right to challenge the franchise fee arrangement.

The City does not directly challenge this conclusion. In fact, the City acknowledges that "[t]he cable television industry's First Amendment challenge to the *concept* of franchising itself has only surfaced in the past two years. At best, then, many of the constitutional issues raised by ETI are ones of first impression." Notwithstanding the lack of waiver, however, the City asserts that ETI should be estopped from challenging the constitutionality of the fee agreement. In this regard, the City directs the Court to the doctrine of quasi-estoppel.

### b. Quasi-Estoppel

■ The doctrine of quasi-estoppel operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party. The doctrine, which is based on fundamental principles of equity, if applied here, would preclude ETI from challenging the constitutionality of the fee agreement once ETI received substantial benefits from the franchise. In common parlance, this doctrine translates into "one cannot blow both hot and cold." *KTVB, Inc. v. Boise City*, 94 Idaho 279, 486 P.2d 992, 994 (1971) *quoting Godoy v. Hawaii*, 44 Hawaii 312, 354 P.2d 78, 82–83 (1960).

The Court in *KTVB* addressed the requisite elements of the defense of estoppel, as well as the rationale underlying its application. The issue in that case was whether certain cable companies should be estopped from challenging the award of a franchise by the city to another company. The trial court found that the plaintiff-cable companies' "having participated in and ac-

quiesced in the procedures leading to the award of the franchise were thereby estopped from challenging that award." *KTVB*, 486 P.2d at 993. The state Supreme Court agreed.

In discussing the doctrine of quasi-estoppel, the Idaho Supreme Court noted that unlike the other types of estoppel, quasi-estoppel is not contingent on a finding of "concealment or misrepresentation of existing facts on the one side, ... [or] ignorance or reliance on the other." *Id.* The court went on to hold that:

[t]he doctrine classified as quasi-estoppel has its basis in election, ratification, affirmance, acquiesence, or acceptance of benefits; and the principle precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit.

*KTVB*, 486 P.2d at 994. *See also United States v. Lamont*, 155 U.S. 303, 309, 15 S.Ct. 97, 99, 39 L.Ed. 160, 164 (1894); *Young v. Amoco Production Co.*, 610 F.Supp. 1479 (E.D.Tex.1985); *In re Estate of Brojack*, 321 Pa.Super. 154, 467 A.2d 1175 (1983).

Relying on the above cited case law, the City argues that ETI should be estopped in its present challenge to the constitutionality of the franchise fee. According to the City, ETI not only suggested the prepayment provision and assented to the 5% fee arrangement, but it has also reaped valuable and substantial benefits from the contract. ETI's position that the fee provision is violative of the cable company's first amendment rights is, argues the City, inequitable, unethical and unconscionable.

The City's position is not without record support. As is clear from the evidence, ETI was an active and aggressive partici-

---

*v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

**9.** Although the eighth circuit directly addressed the first amendment effect of the access channel regulation, *see Midwest Video Corp. v. FCC*, 571

F.2d 1025, 1053–57 (8th Cir.1978), the Supreme Court expressly declined to do so. *See Midwest Video II*, 440 U.S. at 709 n. 19, 99 S.Ct. at 1446 n. 19, 59 L.Ed.2d at 707 n. 19.

pant in the 1980 bidding process. ETI's first franchise proposal provided for the prepayment of franchise fees in the amount of $675,000.[10] ETI's final proposal, which was ultimately accepted by the City, provided for the prepayment of $2,700,000 in fees.[11] ETI's willingness to quadruple the ante indicates that it viewed the franchise as a valuable asset. ETI also received significant value by being the first cable operator in the City of Erie. The effect of this natural monopoly phenomenon has been recognized by the courts [12] and is borne out by the facts in this case. When the City opened bidding for the cable franchise in 1980, six cable companies demonstrated a serious commitment to be considered. Three years later, after ETI had firmly established itself in Erie, not even one cable company would nibble on the City's franchise bait.

■ Although the City's quasi-estoppel argument has emotional appeal, the case law does not support the application of that doctrine to the facts of this case. As the Court in *KTVB* noted, "knowledge of existing rights" is essential in estoppel cases. *KTVB*, 486 P.2d at 995. Accordingly, "[t]he requirements for proper application of quasi-estoppel are, then, that the person against whom it is sought to be applied has previously taken an inconsistent position, *with knowledge of the facts and his rights*, to the detriment of the person seeking application of the doctrine." *Id.* (Emphasis added.)

Given the finding that ETI has not waived its constitutional rights because it lacked knowledge of its rights, this Court must also conclude that ETI is not estopped from asserting those rights. Notwithstanding ETI's active participation in the bidding process, and notwithstanding the benefits it derived from the franchise, this Court cannot conclude, as a matter of law, that ETI had "knowledge of its first amendment rights." Therefore, neither the doctrine of waiver nor the doctrine of estoppel preclude ETI from proceeding with its challenge to the constitutionality of the fee provision.

### 2. ETI's Statutory Claims

■ The City also asserts that ETI should be estopped from bringing a statutory attack against the fee provisions of the franchise agreement. Here, the Court concludes that, unlike ETI's constitutional challenges, the statutory claims involve a circumstance where a known right has been voluntarily relinquished. Therefore, by virtue of ETI's acceptance of the franchise fee terms of the 1980 agreement, ETI is estopped from maintaining a statutory attack for alleged violations which occurred under the law both prior to and subsequent to enactment of the Cable Communications Act of 1984.[13]

The Court reiterates that the doctrine of quasi-estoppel demands a showing that the position currently maintained by a party is inconsistent with a position previously taken by that party. Clearly, by entering into the 1980 franchise and access agreements, ETI took the stance that it considered the agreement to be valid. Although § 19(A) of the franchise agreement compels ETI to comply at all times with state and federal laws and regulations, it can only be a fiction to suggest that ETI was unaware of the franchise fee ceiling set forth in 47

---

**10.** *See* ETI's June 16, 1980 Proposal to the City of Erie.

**11.** *See* Franchise Agreement dated November 11, 1980.

**12.** *See, e.g., Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506, 511 (6th Cir.1972); *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp. 976, 987 (D.R.I.1983) ("Cable operators often compete for a cable franchise but very rarely develop competing cable systems for the same service area. Such a franchising system recognizes the economic realities of the

cable industry, which, as a practical matter, create a 'natural monopoly' for the first cable operator to construct a cable system in a given service area."); *Borough of Scottdale v. National Cable Television Corp.,* 476 Pa. 47, 381 A.2d 859 (1977).

**13.** ETI's attack focuses on whether the franchise agreement complied with 47 C.F.R. § 76.31 (1980) and continues to be valid under § 622 of the Cable Act. This claim principally addresses the issue of whether franchise fee payments have exceeded the ceilings provided in the respective statutes.

C.F.R. § 76.31.[14] This record convincingly demonstrates that ETI and its representatives were knowledgeable participants in cable franchise negotiations in the City of Erie and throughout the country. Accordingly, at the time the instant agreement was negotiated and ultimately entered into, ETI was cognizant of or, at least, was chargeable for having knowledge of the statutory limitations imposed on franchise fee requirements. The Court finds that by accepting the terms of the franchise agreement and its resultant benefits, ETI maintained the position that the fee arrangement was valid and enforceable.

ETI's current position is plainly inconsistent with the stance it assumed in 1980. Despite having previously acquiesced to the payment provisions of the agreement, ETI now asserts that the fees charged are unlawfully excessive. Under principles of quasi-estoppel, ETI must be estopped from claiming that the fees imposed under the agreement are violative of any federal statute.

In its response to this affirmative defense, ETI suggests that it was under duress to extend a franchise offer in excess of what was statutorily authorized. The argument is that in order to be awarded the franchise, ETI was compelled to submit to the City's demands. ETI contends that no alternative course existed, as failing to yield to the City's franchise terms would result in foregoing a privilege which is vital to ETI's livelihood—the authority to use the public rights-of-way. The Court is not persuaded by these "cries of wolf."

As recognized by the FCC, "[t]he process of soliciting bids for cable television franchises often leads to excesses in both demands and offers." *Clarification of the Cable Television Rules*, 46 F.C.C.2d 175, 191 (1974). Here, without condoning the conduct of either the City of Erie or ETI in the solicitation process, this Court refuses to allow ETI to attack these "excesses." Even assuming that but for an offer exceeding statutory limits, ETI would not have been granted the cable franchise, the undisputed fact is that ETI was aware of its statutory rights in 1980. Further, ETI admits that it did not seek enforcement of those rights until 1983 or 1984, when ETI informed the City of its alleged violations. By having failed to seek relief from either the FCC or the courts during the solicitation process or from the City for three years thereafter, ETI certainly took no action to indicate displeasure with this allegedly duressful agreement. *See Levin v. Garfinkle*, 492 F.Supp. 781, 807 (E.D.Pa. 1980) (Proof of duress requires a showing that "(1) serious economic injury was imminent, (2) exerting such pressure that the party involuntarily executed an agreement leading to economic loss, and (3) there was no immediate legal remedy available as an alternative to executing the agreement") (Citation omitted).

In 1980, ETI was in a position to "blow the whistle" on any abuses stemming from the solicitation process. The Court can only assume that ETI chose not to challenge the propriety of the City's demands because ETI was able to outbid its competitors. As winner of the franchise, ETI had no incentive to attack the agreement or the means by which the agreement was gained. Now, facing terms which it considers unfavorable, ETI seeks redress. This hardly suggests a valid claim that duress played a part in ETI's ratification of the franchise agreement. *See Harrison v. Fred S. James, P.A., Inc.*, 558 F.Supp. 438, 443 (E.D.Pa.1983) ("merely because one enters into an agreement which he would not enter if his financial circumstances were more secure, does not mean that a claim

**14.** Section 76.31 of the FCC's Rules, as it read at the outset of Erie's franchising process and continued to read up through Cable Act enactment, provided, in pertinent part:

Franchise fees shall be no more than 3 percent of the franchisee's gross revenues per year from all cable services in the community (including all forms of consideration, such as initial lump sum payments). If the franchise fee is in the range of 3 to 5 percent of such revenues, the fee shall be approved by the Commission if reasonable upon showings: (a) by the franchisee, that it will not interfere with the effectuation of federal regulatory goals in the field of cable television, and (b) that it is appropriate in light of the planned local regulatory program.

47 C.F.R. § 76.31 (1984).

for duress exists as will void the contract") (citation omitted). ETI attempts only to "blow both hot and cold."

Accordingly, as a matter of law, the Court concludes that ETI is estopped from asserting its claim that the franchise agreement violates ETI's statutory rights.

### B. Bar by Virtue of the *Teleprompter* Litigation

The City of Erie next contends that the consent order and mutual release agreement, which settled the case of *Teleprompter of Erie, Inc. v. The City of Erie*, Civil Action No. 81–17 Erie, direct the dismissal of ETI's present attack upon the franchise agreement. Paragraph one of the consent order provides:

1. That the cable television franchise awarded by The City of Erie Telecommunications, Inc. pursuant to the Cable Television Franchise Agreement dated November 11, 1980 and enacted by the City of Erie on December 3, 1980 pursuant to Ordinance # 105–1980 is declared to be valid, lawful and binding and of full force and effect.

Additionally, paragraph six of the mutual release and covenants attachment to the consent order states:

6. *Release by ATC (American Television And Communications Corporation) and ETI of the City, TPT (Teleprompter of Erie, Inc.) and WEC (Westinghouse Electric Corporation).* For and in consideration of, the covenants of the City, TPT, and WEC, as hereinafter set forth, and further good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, ATC and ETI hereby release, remise, quitclaim, and forever discharge the City of Erie, TPT, and WEC from any and all claims, demands, actions or causes of action, damages, judgments, and execution, of whatsoever nature, in any way relating to directly or indirectly, the Franchise together with any and all litigation arising from, or in connection

with, said Agreement, including but not limited to, the pending action from the beginning of the world to the date of these presents.

The City argues that, by virtue of the consent order and mutual release, ETI is either equitably or judicially estopped and/or barred from maintaining the present action.

■ The Court's review of this affirmative defense begins with the premise that the doctrine of equitable estoppel may be applied only if (1) the party asserting estoppel was a party in the prior proceeding and (2) that party has detrimentally relied upon the prior legal position taken by the opponent. *See Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 598 (6th Cir.1982) *citing Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578, 584 (1895).

The more flexible doctrine of judicial estoppel, however, may be invoked even in the absence of detrimental reliance or privity. Thus, a party may be judicially estopped from asserting a legal position which is inconsistent with both a successfully and an unequivocally asserted position in a prior proceeding. *Id.* Short of prevailing in the prior litigation, the position of the party sought to be estopped need only have been accorded judicial acceptance.[15]

With regard to the City's assertion that ETI's claims should be barred, this Court's examination focuses on the applicability of the principles of *res judicata*. "Application of the claim preclusive aspect of the *res judicata* doctrine requires a showing by [the party seeking to invoke the doctrine] that there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir. 1984) (citations omitted).

It must be concluded that, in light of the requirements necessary for the application

---

**15.** "[J]udicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Edwards v. Aetna Life,* 690 F.2d at 599 n. 5.

of estoppel or bar, neither of the settlement documents directs a preclusion of ETI's instant action. ETI's current legal position is quite distinct from the attack on the validity of the franchise agreement found in the *Teleprompter* litigation. The present challenge is to those portions of the franchise and side agreements which require the payment of fees in excess of the legitimate cost of regulation. The challenge is not aimed at the legality of the franchise agreement or process; but rather, it is aimed at the discriminatory aspects of the agreement which effect those users of the public rights-of-way. Clearly, the current action raises issues not contemplated by the *Teleprompter* litigation.

At the time of settlement, the only remaining issue in the *Teleprompter* litigation was whether the City had afforded *Teleprompter* adequate due process rights during the franchise bidding process. *See Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981); *Teleprompter of Erie, Inc. v. City of Erie,* 567 F.Supp. 1277 (W.D.Pa.1983). The legality of franchise fees or access support payments was never made an issue in the prior litigation. Accordingly, because the issue was not contemplated by either ETI or the City for inclusion in the mutual release, the writing may not be construed as a waiver of the present claims.[16]

In light of these undisputed facts, neither of the estoppel theories posited by the City can preclude ETI from bringing this action. "[T]he doctrine of judicial estoppel essentially provides that where a plaintiff has obtained relief from an adversary by asserting and proving one position, he may not later be heard in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *National Union Electric Corp. v.*

*Matsushita Electric Industrial,* 498 F.Supp. 991, 1012 (E.D.Pa.1980) *citing Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510, 513 (3d Cir.1953). Under such standard, it is immediately apparent that if ETI indeed has received relief, that relief did not come from the City. The alignment of ETI and the City as co-defendants in the *Teleprompter* suit, coupled with the fact that their defenses were in no manner inconsistent, indicates that an adversarial relationship did not exist between the parties. Accordingly, there was no need for ETI to take exception to any position asserted by the City against Teleprompter. Moreover, the legal stance now held by ETI may not properly be considered inconsistent with the position taken by ETI during the prior proceeding. It must be emphasized that ETI's present attack is against the franchise fees and access payments assessed by the City, not against the legality of the underlying franchise agreement. The current challenge plainly involves issues distinct from those raised in the *Teleprompter* settlement. Consequently, because ETI has neither received relief from an adversarial party in a prior litigation nor asserted a position inconsistent with the legal theories which it now posits, application of the doctrine of judicial estoppel would be inappropriate.

Similarly, under the requirements imposed for application of the doctrine of equitable estoppel, ETI may not be estopped from bringing the current action. The principle element missing from the City's argument is that no detrimental reliance can be shown. The City speciously attempts to interpret ETI's assent to the *Teleprompter* consent order as evidencing a waiver of a subsequent attack against the fee assessment provided in the franchise agreement. Yet, as ETI did not have the opportunity to fully and fairly litigate the instant claims in the *Teleprompter*

16. Moreover, under the rules of contract construction, the consent order cannot be interpreted as a release of the instant claims. Waiver of a constitutional right is a federal question to be controlled by federal law. *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966). Under federal law, ascertainment of the parties' intention "is to be determined from the writing itself, read in the light of the circumstances surrounding its execution." *Oberweis Dairy v. Associated Milk Producers,* 568 F.Supp. 1096, 1098 (N.D.Ill.1983) (citation omitted). From the perspective of this construction, ETI's release cannot be viewed as a bar or waiver to claims relating to the legality of franchise fees and access support payments.

suit, the City cannot now maintain that it has detrimentally relied upon a legal position which has never been forwarded in a prior proceeding. *See Edwards v. Aetna Life Insurance Co., supra.*

Finally, with regard to the City's argument that *res judicata* principles should bar ETI's present claims, again, it must be concluded that a lack of identity between the issues litigated in the *Teleprompter* action and the current dispute refute the City's position. The City's argument for application of *res judicata* is premised on the theory that essentially similar underlying events have given rise to the legal claims asserted in each action. Yet, the two suits present clearly distinct claims. As mentioned, the *Teleprompter* suit encompassed an attack against franchise bidding procedures. The consent order's providing that the franchise agreement is valid must be read in the limited context that only the validity of the bidding procedure was consented to by the parties in the *Teleprompter* case. The instant litigation pertains to a challenge to franchise fees and access payments. The underlying events supporting these claims have arisen from circumstances different from the bidding process. Because this suit is not based upon the same cause of action as the *Teleprompter* case, ETI's claims may not be precluded by application of the doctrine of *res judicata. See United States v. Athlone Industries, Inc.,* supra.[17]

### C. Statute of Limitations for § 1983 Actions

Lastly, in arguing that ETI's 42 U.S.C. § 1983 claims are time barred, the City asserts that the principles announced in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), should be applied retroactively. In *Wilson v. Garcia,* the Supreme Court concluded that, for purposes of selecting the appropriate statute

of limitation period, claims arising under § 1983 are best characterized as personal injury actions. *Id.,* 471 U.S. at 275, 105 S.Ct. at 1947, 85 L.Ed.2d at 266. Given that the length of the limitations period is governed by state law, *see id.,* Pennsylvania law clearly imposes a two-year statute of limitation upon the commencement of "an action to recover for injuries to the person." 42 Pa.C.S.A. § 5524(2). Therefore, retroactive application of *Wilson v. Garcia* to the instant matter would require ETI to have had filed its § 1983 claims within two years from the time ETI's cause of action accrued. Even accepting the City's contention that ETI's asserted § 1983 claims accrued simultaneously with the signing of the franchise agreement on November 11, 1980, this Court is unwilling to hold ETI's action to be time barred under *Wilson v. Garcia.*

In determining whether a holding is to be given retroactive effect, courts have generally considered three separate factors. As stated by the Supreme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971):

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that 'we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' ... Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our

---

**17.** The City counterclaims that ETI's executing the "Mutual Release and Covenants" and stipulating to the subsequent court order comprised fraudulent and deceitful conduct in light of ETI's current lawsuit against the City. Based upon the instant finding that the *Teleprompter* litigation involved distinct issues from those now asserted, the City's counterclaim is stripped

of its essential underpinnings. No bad faith conduct presently may be attributed to ETI because no prior waiver of an attack against the parties' franchise agreement was ever made. Accordingly, the City's counterclaim alleging that the current suit arises out of ETI's fraudulent and deceitful settlement of the *Teleprompter* litigation is moot.

cases for avoiding the "injustice or hardship" by a holding of non-retroactivity.' *Id.* 404 U.S. at 106–07, 92 S.Ct. at 355–56, 30 L.Ed.2d at 306 (citations omitted); *accord Smith v. City of Pittsburgh*, 764 F.2d 188 (3d Cir) *cert. denied,* — U.S. —, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). Here, in light of the first *Chevron* factor, this Court concludes that the *Wilson v. Garcia* holding may not be retroactively applied.

■ Where a new principle of law has been established which overrules clear past precedent, on which the litigants could reasonably rely, the involved decision may not be given retroactive effect. *See Chevron Oil, supra; Smith v. City of Pittsburgh, supra.* There can be no dispute that *Wilson v. Garcia* established a new principle of law by concluding that federal courts must apply the state personal injury statute of limitations for all § 1983 claims. *Accord Smith v. City of Pittsburgh,* 764 F.2d at 164; *Fitzgerald v. Larson,* 769 F.2d 160, 163 (3d Cir.1985). Accordingly, here, the determinative question is whether clear past precedent existed upon which ETI could reasonably have relied in its effort to timely file this action.

"[W]hen a federal statute creates a wholly federal right but specifies no particular statute of limitations to govern actions under the right, the general rule is to apply the state statute of limitations for analogous types of actions." *Chevron Oil,* 404 U.S. at 104, 92 S.Ct. at 354, 30 L.Ed.2d at 304 (citations omitted). Prior to the Supreme Court's decision in *Wilson v. Garcia,* § 1983 actions were not clearly controlled by a particular statute of limitation. Accordingly, application of the limitation period governing actions most closely analogous to the asserted § 1983 claim became necessary. *See Knoll v. Springfield Township School District,* 699 F.2d 137, 140 (3d Cir.1983), *cert. granted,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984), *vacated per curiam,* 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985), *on remand,* 763 F.2d 584 (3d Cir.1985) *citing Board of Regents v. Tomanio,* 446 U.S. 478, 483–84, 100 S.Ct. 1790, 1794–95, 64 L.Ed.2d 440 (1980). Therefore, under the

first *Chevron* factor, if established precedent indicated that the limitation period for actions analogous to ETI's instant § 1983 claims uniformly exceeded the period established for personal injury actions (if clear and consistent precedent existed which was contrary to *Wilson v. Garcia's* pronouncement of this new principle of law), then ETI's delay in filing this suit was reasonable and retroactive application of *Wilson v. Garcia* would be inappropriate. *Cf. Smith v. City of Pittsburgh,* 764 F.2d at 194–95 ("where application of the law has been erratic and inconsistent, without clear precedent on which plaintiff could reasonably rely in waiting to file suit, a subsequent Supreme Court decision on the applicable limitations period cannot be said to have overruled clear past precedent on which the litigants may have relied") (citations omitted).

This Court's selection of an appropriate limitation period must be based on the state statute of limitation accorded to analogous actions. This borrowing "requires characterization of the essential nature of the federal claim within the scheme created by the various state statute of limitations." *Davis v. United States Steel Supply,* 581 F.2d 335, 337 (3d Cir.1978); *see also Knoll v. Springfield Township School District,* 699 F.2d at 140–41. When stripped of its constitutionally premised underpinnings, ETI's instant claims must be characterized as contractual in nature. ETI's action seeks to have certain sections of the franchise agreement declared unconstitutional, so as to relieve ETI of its economic obligations. The challenge to the agreement focuses on the City's imposition of allegedly unduly burdensome "contractual" provisions. The relief sought is an absolution of specific obligations assumed by ETI when it accepted the conditions necessary to secure the cable television franchise for the City of Erie. In all respects, this litigation is an action upon a contract.

■ Absent the Supreme Court's decision in *Wilson v. Garcia,* the characterization of ETI's § 1983 claims as contractual would require application of the Pennsyl-

vania statute of limitation applicable to contract actions. Under 42 Pa.C.S.A. § 5527(2), "[a]n action upon a contract ... or other instrument in writing," except where specified by statute to the contrary, must be commenced within six years. Although ETI can point to no decision which has characterized claims identical to the instant first and fourteenth amendment challenges as being contractual,[18] this Court is convinced that ETI's § 1983 claims are most closely analogous to those claims found in more "traditional" contract actions and, accordingly, under Pennsylvania law, a six-year statute of limitation would control. Therefore, under 42 Pa.C.S.A. § 5527(2), ETI's filing of this action on July 16, 1985 was timely, even if, as suggested by the City, ETI's cause of action accrued with the signing of the franchise agreement on November 11, 1980. ETI's reliance on statutory treatment afforded to analogous contract actions must be deemed justifiable.[19]

The City argues that cases of *Smith v. City of Pittsburgh* and *Fitzgerald v. Larson* indicate that the Third Circuit Court of Appeals would apply *Wilson v. Garcia* retroactively to the instant matter. *Smith* and *Fitzgerald* present situations wherein Pennsylvania's two-year personal injury statute of limitation was held to retroactively govern § 1983 claims. *Smith* involved a § 1983 claim stemming from an alleged violation of the due process clause of the Fourteenth Amendment because plaintiff was discharged from his employment without proper notice and an adequate opportunity to contest the charges. *Fitzgerald* entailed a § 1983 claim asserting that plaintiff was unlawfully discharged due to his affiliation with the Democratic Party and, as such, the termination was in violation of plaintiff's protected first amendment rights. This Court finds the rationale for applying *Wilson v. Garcia* retroactively to these two decisions inapplicable to the present case.

The law controlling statute of limitation application for causes of action such as those asserted in *Smith* and *Fitzgerald* clearly has been in a state of flux. As noted by the Third Circuit in *Knoll v. Springfield Township School District:*

> Review of the new Pennsylvania limitations schema, however, fails to reveal any provision expressly applicable to claims for the torts of wrongful discharge or interference with contractual or economic rights. *See* 42 Pa.Cons.Stat. Ann. §§ 5521–5536 (Purdon 1981); *Ricco-*

**18.** While no precedent exists which definitively directs application of a specific statute of limitation, ETI does point to the case of *City of Philadelphia v. Holmes Electric Protective Co. of Philadelphia*, 335 Pa. 273, 6 A.2d 884 (1939), in aid of its position. Although the Court does not deem it necessary to rely upon this case in reaching the conclusion that a six-year statute of limitation should apply, *Holmes'* holding, at least to some measure, lends support to the determination. In *Holmes*, the Pennsylvania Supreme Court found the six-year statute of limitation governing contract actions to be controlling in a city's suit to enforce contractual obligations assumed by a burglar alarm system company. Similar to the instant action, the disputed contract involved a company's assent to an ordinance granting the company permission to place wires for the burglar alarm system under the city streets and requiring the company to pay a percentage of the business' resulting gross receipts to the city. *See Id.* Despite *Holmes'* raising different constitutional issues, this Court finds it noteworthy that the Pennsylvania Supreme Court has classified a claim arising out of a city's granting use to the public rights-of-way as contractual.

**19.** The City dismisses the assertion that ETI's § 1983 claims are based in contract by citing to the holding in *Wilson v. Garcia*, that § 1983 actions are best analogized to actions in tort. Indeed, this is a correct characterization of the current state of the law. However, this argument evades what must be considered the essence of the Court's rationale for denying retroactive application. The controlling inquiry is whether ETI's delay in filing can reasonably be attributable to clear precedent which subsequently was overturned. Concurrent with *Wilson v. Garcia's* restructuring of statute of limitation application, the decision impacted on how courts would best analogize § 1983 actions. Prior to *Wilson v. Garcia*, no precedent existed which commanded courts to interpret § 1983 actions as arising solely in tort. "We should not indulge in the fiction that the law now announced has always been the law and, therefore, that those who did not avail themselves of it waived their rights." *Griffin v. Illinois*, 351 U.S. 12, 26, 76 S.Ct. 585, 594, 100 L.Ed. 891, 903 (1956) (Frankfurter J., concurring) *as quoted in Chevron Oil Co. v. Huson*, 404 U.S. at 107, 92 S.Ct. at 355, 30 L.Ed.2d at 306.

*bono v. Whitpain Township,* 497 F.Supp. 1364, 1375 (E.D.Pa.1980). Further, courts considering these torts have ascertained the applicable limitations period by reference to the two residuary provisions of the limitations scheme—the six-month and the six-year statutes of limitations—which control only when the nature of the dispute falls outside one of the more specific limitations provisions. *Compare Clyde v. Thornburg,* 533 F.Supp. 279 (E.D.Pa.1982) (six-month limitations period applicable to § 1983 action) *with Riddick v. Cuyler,* No. 81–0246 (E.D.Pa. July 16, 1981) (six-year limitations period applicable to § 1983 action).

699 F.2d at 141.

No such disparity of interpretation can be attributed to a § 1983 claim based in contract. Unlike actions based in tort for wrongful discharge or interference with contractual or economic rights, actions arising from a contract clearly do fit under a specific statute of limitation provision. *See* 42 Pa.C.S.A. § 5527. Accordingly, under the first *Chevron* factor, this Court concludes that the existence of clear statutory authority for the application of a limitation period in § 1983 contract claims, similar to those presented in the instant action, creates a justifiable foundation for distinguishing cases such as *Smith* or *Fitzgerald.*

"When evaluating the state of the prior law, it is necessary to look to the time when the plaintiff's cause of action arose. If there is a clear precedent at that time upon which plaintiff might reasonably have relied in delaying suit, it is unfair to overturn that reliance after it is too late for the plaintiff to do anything about it." *Al-Khazraji v. Saint Francis College,* 784 F.2d 505, 510–11 (3d Cir.) *cert. granted,* —— U.S. ——, 107 S.Ct. 62, 93 L.Ed.2d 21 (1986). Here, the Court holds that prior to the time *Wilson v. Garcia* was decided, ETI was entitled to reasonably rely on the paradigmatic construction that a contract claim would be governed by the statute of limitations applicable to contract claims. Based upon existing clear precedent, ETI's delay in filing suit must be categorized as reasonable. Thus, this Court refuses to bar ETI's § 1983 claims as being precluded by retroactive application of the *Wilson v. Garcia* decision.

## III. ETI's FIRST AMENDMENT CLAIMS

While not contesting the right of the City of Erie to enter into a franchise agreement with a cable operator, ETI does argue that franchise fees may not exceed what is necessary to cover legitimate administrative and regulatory costs. ETI contends that any licensing fee imposed on a first amendment speaker/publisher may only be used to defray the government's expense of protecting the public's use of the forum against the intrusions of the involved dissemination. Given the construction that any fee in excess of these expenses is a form of prior restraint on the freedoms of speech and the press, ETI maintains that the City has the burden of proving the franchise fees to be no greater than necessary to defray legitimate administrative and regulatory expenses.

ETI also presents a first amendment attack against the franchise's access requirement. As noted, the access requirement calls for ETI's dedication of certain cable channels for the public use together with payments by ETI to the City of Erie in support of local access programming. Availability and use of all free access channels maintained for the public are under the control of a seven member Access Channel Board of Managers, five of whom are appointed by the Erie City Council. ETI argues that on the basis of this arrangement, it has been compelled to finance and televise programming whose content is impermissibly controlled by the City. Accordingly, characterizing the access requirement as a governmental sanctioning of content based prior restraint and citing specific circumstances of such alleged abuse, ETI contends that its first amendment rights as a speaker/publisher have been and continue to be violated.

Lastly, ETI challenges the propriety of the franchise and access agreements on the

ground that the City of Erie has discriminatorily singled out ETI for regulation because of its first amendment activities. ETI argues that the imposition of franchise fees and access requirements unjustly burdens cable operators as compared to other first amendment speaker/publishers and other commercial users of the public rights-of-way. Contending that regulation of first amendment activities is not made justifiable merely because of a governmental interest in raising revenue, ETI claims that its first and fourteenth amendment rights have been violated.

The Court finds each of these first amendment claims to be unpersuasive.

### A. Franchise Fees

■ ETI's challenge to the propriety of the franchise fees is premised on the theory that ETI's freedoms as a first amendment speaker/publisher have been limited. The claimed deprivation stems from the City's alleged conditioning of ETI's right to engage in protected expressive activities upon advance and continuing payments of money. ETI maintains that the City's conditioning the exercise of first amendment rights on the payment of franchise fees constitutes a form of prior restraint on the freedom and, accordingly, bears a heavy burden against being constitutionally valid. The argument follows that guaranteed rights of speech are impaired, because but for the payment of franchise fees, ETI would have available additional funds "to purchase more or better programming, to improve responsiveness to consumer needs and interests, and to finance communication with more subscribers through lower pricing." Plaintiff's Brief in Support of Cross-Motions for Summary Judgment at 22. Further, ETI alleges that as a member of the "electronic press," it is entitled to the first amendment liberty of unrestrained circulation of protected disseminations.

This Court holds that no entitlement for relief exists for this claim.

ETI's attack upon the imposition of the instant franchise fees commands the fundamental determination of whether a local governmental entity possesses the authority to grant the use of the public rights-of-way in return for franchise fees which exceed the entity's administrative or regulatory costs attendant to the grant. Indeed, the prefatory issue is whether a city can rent the public rights-of-way to a commercial enterprise.

In contending that governmental bodies do not possess such authority to rent, ETI emphasizes that the public rights-of-way are not properties owned by the government. *See In re City of Altoona,* 479 Pa. 252, 258, 388 A.2d 313, 316 (1978). Because the City of Erie has no fee title in the public rights-of-way, ETI argues no authority to act as proprietor of these properties exists. The Court finds that regardless of a city's possessory interest in the public streets, a city is justified in conditioning a commercial enterprise's right of passage over public lands upon the payment of a rental fee.[20]

In addressing the issue of whether a local governmental entity is constitutionally authorized to regulate commercial use of public streets, the Pennsylvania Supreme Court long ago recognized:

A valuable franchise, to use public property the street, for corporate profit, is about to be granted. It is not illegal or unreasonable that the public, or the city which represents it, should have a consideration for the privilege that it confers. If it were a right of passage over private property, there would be no question about it, and the right could not be got in any other way. We see no reason why the public interest should not be promoted by requiring special privileges in the public property to be paid in the same way.

20. As noted by the Supreme Court, "the first amendment does not guarantee access to property simply because it is owned or controlled by the government.... 'The State, no less than a private owner of property, has power to preserve the property under its control for the use

to which it is lawfully dedicated.'" *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed. 517, 530 (1981) (citations omitted).

*Allegheny City v. Railway*, 159 Pa. 411, 416–17, 28 A. 202, 203 (1893) *quoted approvingly* in *Borough of Scottdale v. National Cable Television Corp.*, 476 Pa. 47, 381 A.2d 859, 862 (1977). ETI fails to persuade this Court that any lack of fee title by the City of Erie mandates overturning this well reasoned holding.[21]

This Court reads the *Allegheny City v. Railway* case to suggest two principal justifications for permitting a local governmental entity to rent or franchise the public rights-of-way: the need for the entity, first, to operate as a proprietor when dealing with private commercial enterprises and, second, and interrelated, to protect the public interest. Surely, it would be unreasonable to require a city to provide public property at a nominal rental fee to a business which intends to directly utilize this land for the realization of profits. The mere happenstance that a commercial enterprise operates on public properties, rather than private properties, should not provide an exemption for costs which accompany the doing of business.[22] Moreover, as a

city holds the streets in trust for the public, it would be a dereliction of a city's fiduciary duty to grant franchise rights, particularly where the grant acts to exclude other members of the public, without receiving the fair market value for the property.[23]

■ Assuming that local government possesses the power to rent the public rights-of-way, the determinative question becomes whether ETI's status as a first amendment speaker/publisher should limit the City of Erie's ability to charge franchise fees for use of the property. Admittedly, in the proper case, protection of the first amendment speaker must be given preeminent concern over countervailing revenue raising desires held by the state. *See Minneapolis Star and Tribune Company v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Unlike the situation where revenue raising legislation discriminatorily impacts upon a speaker solely on the basis of the speaker's protected status, *see id.*, here, the City of Erie raises revenue by placing on businesses a general cost

**21.** Indeed first amendment jurisprudence is premised on the paradigm that regardless of a fee interest held by municipality, the public rights-of-way are held by the government in trust for the public use. The now familiar words of Mr. Justice Roberts in *Hague v. CIO* clearly embrace this idea: "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

**22.** *See generally, Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767 (2d Cir.1984); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

**23.** There can be no dispute that ETI has benefitted from the award of the cable franchise. ETI was given the first opportunity to wire the City of Erie for cable television reception. In an industry where the award of a franchise oftentimes creates a natural monopoly in a local market, *see Omega Satellite Products v. City of Indianapolis*, 694 F.2d 119, 127–28 (7th Cir. 1982); *Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976, 985 (D.R.I.1983) *vacated as moot* 773 F.2d 382 (1st Cir.1985), a franchise recipient, in the very least, receives a competi-

tive advantage over would-be entrants into the market.

The City's grant of the franchise has insulated ETI from competition and, inevitably, acted to exclude other cable operators from being able to "speak." As the City holds the public rights-of-way in trust for the public, this Court is compelled to allow the City to execute this duty by protecting the interest of all at the expense of the franchise grantee, ETI. It surely is not a fiction to suggest that the general public and even those cable operators excluded from the forum are beneficiaries of the required franchise fee payments. Again, this Court finds the words of Mr. Justice Roberts in *Hague v. CIO* particularly relevant:

The privilege of a citizen of the United States to use the streets and public parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but, relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied. 307 U.S. at 515–16, 59 S.Ct. at 964, 83 L.Ed. 1423. Here, finding no first amendment freedom to be abridged or denied, *see infra* at pp. 596–598, the Court refuses to strike a regulation which emanates from government acting in its fiduciary capacity to manage the public rights-of-way.

of conducting business on the public rights-of-way. While a local governmental entity is permitted only to reallocate the administrative and regulatory costs which accompany the exercise of first amendment disseminations, *see, e.g., Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), there exists no such limitation on the imposition of a fee for transacting business. *See, e.g., Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority, supra.*[24] As recognized by the United States Supreme Court in *Minneapolis Star,* even the press is subject to revenue raising plans instituted by the state, provided that the measures apply to businesses generally and, thereby, avoid the censorial threat accompanying taxes which single out the press. *Id.,* 460 U.S. at 586, 103 S.Ct. at 1372, 75 L.Ed.2d at 305.[25]

The *Minneapolis Star* opinion notes that where a first amendment speaker is subjected to a tax which acts as a condition of the right to speak, the Supreme Court has held the tax to be a form of prior restraint and, consequently, highly susceptible to constitutional challenge. *Id.* at 586 n. 9, 103 S.Ct. at 1372 n. 9, 75 L.Ed.2d at 305–06 n. 9 *citing Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Jones v. Opelika,* 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943). As explained by the *Minneapolis Star* Court, "[i]n each of those cases, the local government imposed a flat tax, unrelated to the receipts or income of the speaker or to the expenses of administering a valid regulatory scheme, as a *condition* of the right to speak." *Id.* However, notably, the Supreme Court has upheld an ordinance prohibiting door-to-door solicitation, the impact of which was to prevent the sale of magazine subscriptions. *Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Even though this activity falls within the purview of first amendment protection, the *Breard* Court found it important that the solicitation of magazines involved neither information which was religious in nature nor a distribution which could be characterized as noncommercial. *Minneapolis Star,* 460 U.S. at 586 n. 9, 103 S.Ct. at 1372 n. 9, 75 L.Ed.2d at 305–06 n. 9 *citing Breard v. Alexandria,* 341 U.S. at 642–43, 71 S.Ct. at 932–33, 95 L.Ed. at 1248.[26]

Relying on the *Minneapolis Star* opinion and its interpretation of past Supreme Court precedent, this Court concludes that provided a general flat tax is not a condition of the right to speak, the tax may be

24. The *Gannett Satellite* opinion notes that where government is acting in a proprietary capacity, rather than a traditional governmental capacity, licensing fees imposed upon an enterprise holding first amendment rights may exceed administrative or regulatory costs. "When a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest." *Gannett Satellite,* 745 F.2d at 774–75.

ETI maintains that the *Gannett Satellite* case is distinguishable from the instant scenario because *Gannett Satellite* involved a city's licensing property which was owned by the city. ETI emphasizes that the City of Erie does not own the public rights-of-way. Yet, the Court is not persuaded that this distinction is of critical importance. The crucial determination is whether the government agency is empowered to act in a proprietary capacity over the public land in its ownership or, as in the instant case, control.

25. Although the *Minneapolis Star* case involved the imposition of a tax on a "first amendment" enterprise, whereas the instant scenario pertains to the exacting of franchise fees, this Court finds the Supreme Court's analysis presently applicable. Regardless of whether an imposed fee is characterized as a tax, license, franchise, or rental, the fee only is violative of the first amendment if it acts as a condition of the right to speak. Hence, the Court employs the *Minneapolis Star* opinion to aid in the determination of whether payment of the instant franchise fee is a condition of ETI's exercise of guaranteed freedoms.

26. The magazines and periodicals solicited in *Breard* included among others the Saturday Evening Post, Ladies Home Journal, Country Gentleman, Holiday, Newsweek, American Home, Cosmopolitan, Esquire, Pic, Parents, Today's Woman and True. The Supreme Court clearly relied on the fact that these magazines were commercially distributed and were not religiously oriented in distinguishing the *Martin v. Struthers* case. *Breard v. Alexandria,* 341 U.S. at 642–43, 71 S.Ct. 932–33, 95 L.Ed. at 1248 *citing Martin v. Struthers,* 319 U.S. at 142 n. 1, 63 S.Ct. 862 n. 1, 87 L.Ed. at 1316 n. 1 ("This ordinance was not directed solely at commercial advertising.").

tied to the receipts or income of the speaker, as well as to administrative or regulatory expenses incurred by the governmental entity. Additionally, first amendment protections claimed by the speaker need not be given impenetrable stature if the dissemination invokes commercial distribution and is not of the type traditionally protected under the first amendment umbrella of rights.

Here, the Court finds that the City's tying of franchise fee payments to ETI's gross receipts does not constitute a condition to the exercise of ETI's first amendment rights. Although the City of Erie apparently has not imposed similar franchise requirements on other commercial enterprises, the constitutionality of the ETI franchise fee is not presumptively suspect. The crucial fact is that the City is empowered to charge franchise fees for the commercial use of the public rights-of-way. *See Allegheny City v. Railway, supra.* Nothing on this record suggests that the City's motivation for exacting the fee was other than for revenue raising purposes. *Compare Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (motivation of legislature which indicated tax was imposed with intent to penalize selected group of newspapers relevant to ultimate finding of unconstitutionality).[27] While this Court is uncertain as to the reasons underlying the City of Erie's failure to impose comparable fees upon other commercial users of the public rights-of-way (the most obvious explanation to this Court being that no other commercial enterprise interferes with or derives profit from the use of the public lands to the extent that cable television does), this record does not establish that franchise fees have been discriminatorily demanded as a condition of the right to speak. All that is shown is that ETI may not use the public rights-of-way to conduct business without remunerating the City of Erie. There is nothing unconstitutional about a city raising revenues through proper means.

Furthermore, ETI's claims of first amendment deprivation are eroded by the nature of the distribution and the type of speech being disseminated. *See Minneapolis Star, supra.* Clearly, ETI's distribution of cable signals is performed for the realization of profits. As indicated by the *Breard v. Alexandria* decision, where speech involves commercial solicitation, first amendment protections afforded the speaker are diminished. *Breard v. Alexandria,* 341 U.S. at 643, 71 S.Ct. at 933, 95 L.Ed. at 1248; *see also Murdock v. Pennsylvania,* 319 U.S. at 110–12, 63 S.Ct. at 873–74, 87 L.Ed. at 1297–98. Additionally, ETI cannot assert that speech disseminated by cable operators traditionally has been given the same degree of first amendment protection as that promulgated by newspapers. As explained by the Tenth Circuit Court of Appeals in *Community Communications Company, Inc. v. City of Boulder, Colorado,* "[t]he attributes of cable broadcasting technology indicate that the nearly absolute strictures against direct governmental regulation of newspapers' dissemination of information cannot be applied in wholesale fashion to cable operators." 660 F.2d 1370, 1377 (10th Cir.1981) (footnote omitted); *see also Omega Satellite Products Company v. City of Indianapolis,* 694 F.2d at 127–28 (7th Cir.1982) *citing City of Boulder,* 660 F.2d at 1377–80 ("Probably there are enough differences between cable television and the nontelevision media to allow more governmental regulation of the former.").

Although ETI's use of the public rights-of-way may not be as profitable as ETI would hope, this Court concludes that the imposed franchise fees do not place an inhibition on the content of ETI's speech. ETI has chosen to distribute a technically advanced form of speech. This Court is aware of no command of the first amendment which directs the government to make this distribution economically feasible so as to facilitate the speaker's ability to speak. If ETI's speech is inhibited, it is because of the realities of the marketplace, not because the government has impermis-

---

**27.** This interpretation of *Grosjean* is supported by the *Minneapolis Star* Court. 460 U.S. at 579–81, 103 S.Ct. at 1368–69, 75 L.Ed.2d at 301–02.

sibly conditioned speech on the excise of money payments. Therefore, the Court finds the City of Erie's conditioning ETI's commercial use of the public rights-of-way upon the payment of franchise fees to be constitutionally valid under the first amendment.

## B. Access Requirements

Pursuant to the access or side agreement and the franchise agreement, ETI is obligated to make cash payments and satisfy "in-kind" requirements of dedicating channel capacity, television production equipment, and training for the public use of access channels. ETI asserts two principal first amendment challenges to the access requirements. Initially, ETI argues that because the City cannot claim that the access fee and in-kind payments are related to the regulation or administration of the public rights-of-way, the provision is constitutionally suspect under the holding of *Murdock v. Pennsylvania*, 319 U.S. at 116–17, 63 S.Ct. at 876, 87 L.Ed.2d at 1300. Secondly, ETI contends that the payment requirements violate the first amendment since they involve a content-based expropriation by the City of ETI's editorial discretion. ETI alleges that the effect of the access agreement is to empower the Erie City Council and the Access Channel Board of Managers to act as "censorship czars" of the public, educational and government access channels. Finding ETI's attack against the constitutional validity of access requirements to be unpersuasive, and ETI to lack standing to challenge the City's implementation of the access scheme, the Court concludes that under these theories, ETI is unable to establish an entitlement for relief.[28]

Although not dispositive of ETI's constitutional challenge to the access plan, the Court notes that the Cable Communications Policy Act of 1984 has incorporated access requirement provisions. Congress specifically considered the first amendment implications accompanying this legislation. *See* H.R.Rep. No. 98–934, 98th Cong.2d Sess. 19, 31 *reprinted in* 1984 *U.S.Code Cong. & Admin.News* 4655, 4668. As provided in the Act's legislative history:

> CABLE ACCESS: FIRST AMENDMENT CONSIDERATIONS
>
> H.R. 4103 includes several provisions, specifically those related to PEG (public, educational, and government) and commercial access, which may require that certain channels or portions of channels on a cable system be available for programming and controlled by a person other than the cable operator. The committee is aware that access provisions have been challenged in the court as inconsistent with the First Amendment rights of the cable operator. The Committee believes, nonetheless, that the access provisions contained in this legislation are consistent with and further the goals of the First Amendment. The provision[s] establish a form of content-neutral structural regulation which will foster the availability of a "diversity of viewpoints" to the listening audience. In the past, courts have held a similar regulation to be consistent with the First Amendment.

*Id.* Additionally, in regard to the argument that access requirements constitute a form of content-based regulation, the legislative committee stated:

> Access channel requirements fit squarely within the category of limited structural regulation of the media that has been consistently upheld by the courts as a constitutionally-permissible means of encouraging a diversity of information sources. Cable access regulations are "content neutral, yet substantially increase [] the number of voices that can

---

**28.** ETI argues that the cash payments required by the access agreement raise an independent ground for constitutional review. The Court disagrees. The determination that franchise fees do not infringe upon a cable operator's first amendment rights necessarily encompasses the payment of all fees. The access fees merely ⁀nprise a component of the entire franchise fee structure. Accordingly, by having rejected ETI's claim that the imposed franchise fees are constitutionally invalid, the Court has also disposed of ETI's challenge based on the payment of the access fees. The distinction between access fees and franchise fees is relevant only for the purpose of determining compliance with the federal franchise fee limitation.

reach the home. Access requirements may provide a way of promoting diversity without straining the First Amendment."

*Id.* at 33–34, 1984 *U.S. Code Cong. & Admin.News* at 4670–71 *quoting* D. Bazelon, *The First Amendment and the "New Media"—New Directions in Regulating Telecommunications,* 31 Fed.Com.L.J. 201, 210 (1979).

The Cable Communications Policy Act of 1984 must be examined in light of the Supreme Court's 1979 decision in *Midwest Video Corp. v. F.C.C.,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (*Midwest Video II* ). The decision, which predates the signing of the instant agreement, affirmed the eighth circuit's holding that the F.C.C. lacked statutory authority to promulgate mandatory access requirements for cable television. *Id.* at 709, 99 S.Ct. at 1446, 59 L.Ed.2d at 707. Accordingly, the 1984 Act can serve only as a guideline for the imposition of access requirements by local government on cable operators.

What is crucial for the purposes of this review is that the Supreme Court has explicitly left open the question of whether access regulations could survive first amendment challenges. As stated by the *Midwest Video II* Court, "[b]ecause our decision rests on statutory grounds, we express no view on that question, save to acknowledge that it is not frivolous and to make clear that the asserted constitutional issue did not determine or sharply influence our construction of the statute." *Id.* at n. 19. Clearly, as evidenced by the 1984 Act's legislative history, Congress' promulgation of a recommended access policy for franchising authorities is an attempt to satisfy the concerns of the *Midwest Video II* opinion.

This Court is convinced that access requirements further secure the foundation upon which the first amendment is grounded—promotion of a marketplace of ideas.[29]

In the *Berkshire Cablevision* case, the District Court of Rhode Island aptly recognized the worth of community participation in this developing forum.

If cable is to become a constructive force in our national life, it must be open to all Americans. There must be relatively easy access ... for those who wish to promote their ideas, state their views, or sell their goods and services.... This unfettered flow of information is central to freedom of speech and freedom of the press which have described correctly as the freedom upon which all of our other rights depend.

*Berkshire Cablevision of Rhode Island, Inc. v. Burke,* 571 F.Supp. at 987 *quoting* Cabinet Committee on Cable Communications, Report to the President at 19 (1974). Access requirements clearly further the substantial governmental interest of making cable television available for the dissemination of ideas by the general citizenry. *Accord id.* at 986; *compare Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389 (In addressing the constitutionality of the F.C.C.'s regulation of radio station programming, the Supreme Court noted that "the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.").

Admittedly, access requirements limit the editorial discretion which cable operators hold over the content of their broadcasts. However, the Court concludes that this infringement is justifiable in light of the regulatory interest held by franchising authorities. As enunciated by the Supreme Court in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968):

a government regulation is sufficiently justified (1) if it is within the constitutional power of the Government; (2) if it

**29.** *See generally Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371, 389 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than countenance monopolization of that market, whether it be by the Government itself or a private licensee.").

furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679, 20 L.Ed.2d at 680 (parentheses added). The City's imposition of access requirements constitutes a regulation which satisfies each of the elements demanded by the *United States v. O'Brien* opinion.

The Court's first amendment analysis is grounded on certain fundamental notions concerning cable television which, in and of themselves, dispose of the first three *O'Brien* concerns. First, with regard to whether the government possesses the power to regulate cable operators, the Court once again notes that the medium has not historically been insulated from regulation. *See Community Communications v. City of Boulder, Colorado*, 660 F.2d at 1378 n. 9, 1379; *Omega Satellite Products Company v. City of Indianapolis*, 694 F.2d at 127–28; *Berkshire Cablevision*, 571 F.Supp. at 985; *but see Midwest Video Corp. v. F.C.C.*, 571 F.2d 1025 (8th Cir.) *aff'd on statutory grounds* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). Cable television's physical intrusion into the public rights-of-way and the ease with which operators are able to create a natural monopoly in a local market have provided justification for governmental regulation.[30]

Second, with regard to the extent of the governmental interest, as previously mentioned, governmental entities clearly possess a substantial interest in affording full first amendment protection to the viewers (and listeners) of telecommunication broadcasts. *Accord Berkshire Cablevision*, 571 F.Supp. at 987–88; *see also* H.R.Rep. No. 98–934, 98th Cong.2d Sess. 19 *reprinted in* 1984 *U.S.Code Cong. & Admin.News* 4665.

Third, with regard to whether the governmental interest is unrelated to the suppression of free expression, absent facially discriminatory language in the regulation or other record support which demonstrates discriminatory intent, the Court refuses to presume a regulation to be enacted for censorial purposes. *See Minneapolis Star*, 460 U.S. at 580, 103 S.Ct. at 1369, 75 L.Ed.2d at 301–02; *Grosjean v. American Press Co., supra.* Here, the plain language of the franchise agreement reveals that the access requirements are intended to make cable channels available to the public on a first-come, first-served, nondiscriminatory basis. While these requirements may produce an incidental effect of limiting ETI's first amendment freedoms, there is no evidence to suggest that the mandatory access regulations were directed at suppressing ETI's disseminations. *See Berkshire Cablevision of Rhode Island, Inc. v. Burke*, 571 F.Supp. at 987. Accordingly, under the *O'Brien* standard, the only remaining consideration is whether the access plan constitutes an essential restriction on ETI's freedom of expression.

In regard to the last *O'Brien* factor, the Court concludes that the instant access requirements present an incidental restriction on alleged first amendment freedoms which is no greater than is essential to the furtherance of an important or substantial governmental interest. Section 23(F) of the franchise agreement provides that ETI must make available thirteen channels for the public use.[31] These thirteen access channels are to be part of a cable system comprising a minimum capacity of eighty-

---

**30.** ETI argues that the Supreme Court's holding in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), which prohibited access requirements from being imposed on newspapers, is applicable to cable television. Yet, as noted by the *Red Lion* Court, "differences in the characteristics of news media justify differences in the First Amendment standards applied to them." *Red Lion*, 395 U.S. at 386, 89 S.Ct. at 1804, 23 L.Ed.2d at 387.

**31.** Section 3(1) of the franchise agreement defines the thirteen access channels to include one public, three educational, one religious, one library, one social service, one arts and sports, one hospital, two leased, and two governmental access channels.

four downstream channels.[32] Although the record reveals that the number of cable channels in active use is less than the required minimum capacity, the Court finds it of critical importance that ETI maintains complete editorial control over a substantial majority of its potential cable system. The instant mandatory access regulations produce only a minimal intrusion on ETI's exercise of first amendment rights. *Accord Berkshire Cablevision*, 571 F.Supp. at 979 (where no more than seven of fifty or more channels are set aside for public access, the requirement's restriction on first amendment freedoms was found to be no greater than essential to further the substantial governmental interest); *see also* H.R.Rep. No. 98–934, 98th Cong.2d. Sess. at 36, 1984 *U.S. Code Cong. & Admin. News* at 4673 ("Because cable has many channels available, a relative few devoted to access uses would not unduly impinge on the cable operator's journalistic or editorial function.") Accordingly, in consideration of the standards set forth in *United States v. O'Brien*, the Court holds that the City of Erie's access requirements do not violate the first amendment.

■ Based upon the Court's conclusion that the terms of the access plan are not constitutionally invalid, ETI is unable to posit any alternative challenge to the plan's implementation. By upholding the City's privilege to impose access requirements on ETI, the Court has found that the resultant infringement on ETI's editorial discretion is not of the magnitude necessary to constitute a first amendment violation. Accordingly, because ETI's first amendment rights are not abridged by requiring the dedication of access channels for the public use, ETI has no basis for asserting that the channels are improperly managed. ETI can claim no first amendment injury as it possesses no editorial control over the disseminations broadcast on ETI dedicated access channels. If, as alleged by ETI, the Erie City Council through its arm, the Access Channel Board of Managers, has unconstitutionally regulated the content of access programming, the challenge must be brought by a party injured by the channel's operation. While the Board's composition and scope of authority may be subject to attacks by those denied access to the channels, by those regulated in their use of the medium, or by the viewing public, the Court concludes that ETI lacks standing to present a claim that ETI's control over the channels has been unconstitutionally abridged. *See generally, Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, 962 (1968) ("the emphasis in standing problems is on whether the party involving federal court jurisdiction has 'a personal stake in the outcome of the controversy' and whether the dispute touches upon 'the legal relations of the parties having adverse legal interests'") (citations omitted).

### C. "Singling Out" ETI From Others

■ ETI lastly challenges the franchise agreement as being violative of the first amendment because the attendant obligations impermissibly single out ETI from other speaker/publishers and from other businesses generally. Citing to the *Minneapolis Star* and *Grosjean* cases, ETI argues that local governments are barred from imposing fees which target the media as a whole or single out one member of the media while exempting others. ETI maintains that the required payment of franchise fees and other cash and in-kind obligations result in such a discriminatory burden. Contending that the City has no compelling justification for imposing these franchise requirements, ETI asserts that its first amendment rights as a speaker/publisher have been abrogated. Based upon the analysis employed to address ETI's attacks against the franchise and access agreements, the Court concludes that the instant claim also lacks merit.

Initially, with regard to the suggestion that the City of Erie has singled out ETI for payments of franchise fees, the Court only need reiterate its earlier analysis.

---

**32.** Section 3(16) of the franchise agreement defines "downstream" as those signals which travel from a cable system's head-end, the electronic transmission equipment, to a subscriber's location.

Clearly, the City is empowered to charge fees for the use of the public rights-of-way. *See Allegheny City v. Railway,* 159 Pa. 411, 28 A. 202 (1893). There is no record support demonstrating that the City's motivation in imposing the franchise fee was other than for revenue raising purposes. Therefore, the fee, being attributable to the cost of doing business, is wholly justifiable. *See infra* at II.A. Accepting ETI's allegations as true, that the City does not impose similar fees on other users of the public rights-of-way, such as on Erie's electric utility, gas company, or telephone company, there still exists no evidence indicating a first amendment violation.[33] Again, the crucial point is that governmental regulation of even the print media does not create constitutional problems, provided the regulation is part of a general scheme which is not applied for censorial purposes. *See Minneapolis Star,* 460 U.S. at 581, 103 S.Ct. at 1369, 75 L.Ed.2d at 302.

Here, finding no censorial intent to exist in either the franchise agreement or the circumstances surrounding the passage of the "franchise" ordinance, the Court refuses to hold that ETI has been discriminated against on the basis of its protected status. If the City has treated ETI differently from other first amendment disseminators, justification for doing so lies in the commercial realities of the marketplace. As previously noted, cable television both interferes with and derives profit from the use of the public rights-of-way. For the purposes of ETI's instant first amendment challenge, this Court need not speculate as to whether the alleged differential treatment is the product of a rational legislative determination. It is sufficient to note that the scheme for regulation is devoid of censorial motivation.

Secondly, with regard to the argument that the City's imposition of access requirements discriminatorily impacts on ETI's status as a first amendment speaker/publisher, the Court again emphasizes that differences in the characteristics of news media provide a basis for applying distinct first amendment standards. *See Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. at 386, 89 S.Ct. at 1804, 23 L.Ed.2d at 387. Just as special concerns justify the F.C.C.'s regulation of broadcast programming, *see Red Lion, supra,* so too do the unusual features of cable television warrant local government's imposition of access requirements. If, as alleged, regulation of ETI differs from that imposed on other members of the media, this treatment is merely reflective of the realization that cable television possesses a distinct personality, requiring individualized regulation. As indicated by the Supreme Court in its *Red Lion* opinion, government must be afforded an opportunity to conform its regulation of the telecommunications media so as to fully protect the first amendment interest of the general public. *See id.,* 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389.

Accordingly, because the Court finds that the assessment of franchise fees does not implicate an abridgement of constitutional protections and that the imposition of access requirements, while arguably infringing upon the protected freedoms of cable operators, is justifiable as serving a "legitimate overriding governmental interest," *see Minneapolis Star,* 460 U.S. at 583 n. 3, 103 S.Ct. at 1369 n. 3, 75 L.Ed.2d at 305 n. 3, any differential treatment of ETI does not constitute a first amendment violation.

---

**33.** ETI argues that the City's charging ETI for assistance in securing utility pole attachments allows the City to profit from property rights it does not hold. Once having paid the telephone company, General Telephone, for space on the poles, ETI asserts that it cannot also be required to pay the City. The Court rejects this contention.

As with the imposition of access fees, pole attachment fees merely comprise a component of the entire franchise fee structure. Although the utility company may hold an easement over the existing poles, regulation of the poles is entrusted to local government as holder of the property in trust for the public. Again, the Court concludes that the governmental entity must be permitted to enact a regulatory scheme which satisfies its fiduciary responsibilities over the property's management. Accordingly, the constitutionality of pole attachment fees may be treated in the same manner as other fees which comprise the whole franchise fee arrangement.

## IV. ETI'S EQUAL PROTECTION CLAIMS

Similar to the allegation that the "singling out" of ETI constitutes a first amendment violation, ETI maintains that this same discriminatory treatment contravenes the equal protection clause of the fourteenth amendment. ETI's claim is premised on the assertion that the City has conditioned ETI's exercise of first amendment rights upon certain required payments. Because this scheme implicates an infringement of a fundamental right, ETI argues that the City's regulation must survive strict scrutiny review in order to pass constitutional muster. ETI contends that other members of the communications media use the public rights-of-way in a manner identical to ETI's use. As ETI's use of the public rights-of-way provides the basis for the City's imposition of franchise and access obligations, ETI asserts that the City lacks a compelling interest for justifying discriminatory classification of cable television operators.

The Court does not dispute ETI's characterization of the applicable law. Clearly, where a legislative classification impermissibly interferes with the exercise of fundamental rights, the fourteenth amendment subjects the governmental action to strict judicial scrutiny. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976) (per curiam). Thus, as explained by the Supreme Court, "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Department of the City of Chicago v. Mosely,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212, 220 (1972) (citations omitted). "[T]he crucial question

is whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Id.,* 408 U.S. at 95, 92 S.Ct. at 2289, 33 L.Ed.2d at 216 (citations omitted).[34] In consideration of this constitutional standard, the Court concludes that the instant regulatory scheme is not violative of the equal protection clause.

Initially, as has previously been set forth, the Court finds that the City of Erie possesses a compelling interest for regulating cable television. With regard to the payment of franchise and other related fees, justification for regulation lies in the fact that local government holds the public rights-of-way in trust for the public. In carrying out its fiduciary responsibilities, government must demand that those who use the public lands to the exclusion of others compensate the public for that use.[35] Further, with regard to the access requirements, regulation is warranted in light of the public's right to receive "suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. at 390, 89 S.Ct. at 1806, 23 L.Ed.2d at 389. In its effort to preserve an uninhibited marketplace of ideas, government is entrusted with protecting the first amendment rights of cable television viewers. *See generally id.; see infra* at II.B. Accordingly, the Court holds that the regulations imposed under both the franchise and access agreements promote compelling governmental interests.

Next, the Court finds that alleged distinctive treatment which results from the City's regulatory plan is not discriminatorily motivated. ETI claims that the franchise and access requirements derive from a classification which is underinclusive in

---

**34.** The Supreme Court has defined the equal protection clause test as follows: "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully tailored." *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263, 270 (1980) (citations omitted). Although the no-

menclature comprising this test may shift from "compelling governmental interest" to "substantial state interest" and from "narrowly tailored" to "finely tailored," clearly the essential constitutional requirements remain constant. *Compare id. with Police Department of the City of Chicago v. Mosely, supra.*

**35.** *See infra* at footnote 23 and accompanying text.

that all other media users of the public rights-of-way are not similarly regulated. This claim is refuted by the unique nature of ETI's business activity. Clearly, ETI's use of the public rights-of-way is dissimilar from that employed by a radio or television station or a newspaper.

Unlike the transmission of radio or television signals or the circulation of a newspaper, ETI's distribution of cable signals is accomplished by carrying the dissemination through the public rights-of-way. While it may be argued that ETI's means of distribution does not significantly differ from that of other media communicators, such contention ignores the degree of dependence which ETI has placed on use of the public streets. The obvious distinction between cable and other forms of media is that passage through the streets is an incidental consequence of a radio or television station's or a newspaper's dissemination, whereas cable television's chosen means of dissemination utilizes the street as a conduit for speech. Newspaper communications originate at the printing press. Radio and television disseminations emanate from a transmitter. Yet, cable television's message flows from a system comprised of coaxial cables which run along the public rights-of-way. Given the construct of ETI's cable system, the public streets are an essential resource, without which dissemination would be impossible.

Consequently, the Court concludes that any failure of the City to impose cash and in-kind fee requirements on other media forms is attributable to the extensive degree to which ETI's business activity involves the use of the public rights-of-way. Regardless of its disparate impact, this classification is not directed at burdening ETI's exercise of a fundamental right.

Lastly, the Court finds that the franchise and access agreements impose obligations which are "narrowly tailored" to serve the instant compelling governmental interests. With regard to the payment of franchise fees, ETI argues that the fees must correspond to the City's recovery of regulatory and administrative costs. Even assuming

that ETI's first amendment rights have been affected, despite the Court's holding that the instant regulation does not discriminatorily classify ETI because of its exercise of a fundamental right, no valid claim exists to suggest fees must be limited to regulatory and administrative expenses. As previously noted, the City is charged with the fiduciary duty of holding the public rights-of-way. Accordingly, when a commercial entity uses this public property to the exclusion of others, local government must be permitted to demand, absent valid statutory authority to the contrary, fair market value in return for the grant of a franchise.[36] On this record, there can be no dispute that the procedure employed prior to the awarding of ETI's franchise has forced the City to offer a fair market rate for the sale of the instant privilege. The City's receiving fair market value for ETI's use of the public rights-of-way suitably furthers the City's compelling duty of acting as a trustee over these public properties.

Additionally, with regard to the access requirements, the Court concludes that these obligations also are "narrowly tailored" so as to further the compelling governmental interest of assuring access to the cable media by people other than franchise operators. These requirements allow for reasonable third-party access, without the accompanying need to regulate the cable operator's own editorial control over the vast majority of its programming. See infra at II.B.; see also Berkshire Cablevision, supra. Unlike access requirements which mandate that the media provide speakers with an opportunity to respond to the opinions of others, see Miami Herald v. Tornillo, supra, ETI's obligation to set aside channel capacity is not tied to what ETI chooses to disseminate. As noted by the legislative committee for the 1984 Cable Act in reference to the first amendment concerns presented by access requirements, "[t]he right of access is not contingent on what the cable operator states. It works automatically, and without extensive governmental intervention." H.R.Rep. No.

---

**36.** See infra at footnote 23 and accompanying text.

98–934, 98th Cong.2d Sess. at 35, *1984 U.S. Code Cong. & Admin.News,* at 4672. Here, the City's access requirements plainly involve structural regulation of ETI's cable system, without intrusion into the content of ETI's programming choices. *See id.*

Moreover, the instant access agreement provides that to the extent that either the dedicated fixed studio and its equipment or the mobile facility and its equipment are not being put to access cablecasting program production, this equipment shall be available for ETI's own use. *See Franchise Agreement* at §§ 23(G)(1)(d), (2)(c). Further, as provided in the side agreement, after a specified date, "if for any three (3) consecutive calendar months there has not been provided an average of at least one (1) hour of locally produced program(s) per week for access cablecasting," then all of ETI's remaining access payments may be suspended. *See Side Agreement* at § 8. Accordingly, the Court concludes that these provisions which allow ETI to use equipment and to suspend payments where access is not being utilized narrowly tailor the access requirements so as to fully accomodate ETI's interests.

The Court holds that neither the franchise nor access agreements contravene the strictures of the equal protection clause.

## V. CONCLUSION

Given the Court's finding that ETI's constitutional claims are as a matter of law devoid of merit and that its statutory claim has been waived, the City of Erie is entitled to summary judgment dismissing ETI's cause of action and granting relief for its own contractual counterclaim. Accordingly, the Court holds that the City of Erie has established its entitlement for a recovery of unpaid franchise fees and access payments and directs a hearing be set to determine damages.[37]

An appropriate order will issue.

## ORDER

AND NOW, this 15th day of April, 1987, in accordance with the accompanying Opinion,

IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Summary Judgment is DENIED;

(2) Defendant's Motion of Partial Summary Judgment is GRANTED with respect to Plaintiff's claims for First and Fourteenth Amendment relief and Plaintiff's claim for statutory relief under the Cable Communications Policy Act of 1984;

(3) Plaintiff's claims arising under Article I, Sections 1, 7, and 26 of the Constitution of the Commonwealth of Pennsylvania are DISMISSED WITHOUT PREJUDICE;

(4) Defendant's counterclaim alleging that Plaintiff has fraudulently entered into the instant franchise and side agreements is DISMISSED WITHOUT PREJUDICE:

(5) Defendant's counterclaim alleging that the instant litigation stems from a fraudulent settlement of *Teleprompter of Erie, Inc. v. City of Erie,* Civil Action 81–17 Erie, is DISMISSED AS MOOT;

(6) Defendant's Motion for Partial Summary Judgment is GRANTED with respect to Defendant's counterclaim alleging that

---

**37.** Although the Court's disposition denies ETI relief under its federal claims, ETI's complaint contains claims made under the free speech, free press, and equal protection provisions of the Pennsylvania Constitution. Acting within the discretionary authority provided by the case of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court will not entertain jurisdiction over these pendent state law claims. As warned by the Supreme Court in *Gibbs,* "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.,* 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228 (footnote omitted).

Additionally, although the Court's denial of the City's affirmative defense, that the Consent Order and "Mutual Release and Covenants" forecloses the instant action, disposes of the City's counterclaim that ETI's tortious conduct lead to the Teleprompter settlement, *see infra* at footnote 17, another counterclaim sounding in tort remains unaddressed. As with ETI's state law claims, the Court will exercise its discretion to dismiss the City's state law counterclaim asserting that ETI tortiously entered into the franchise and side agreements. *See Gibbs, supra.*

Plaintiffs are in breach of the contractual provisions of the instant franchise and side agreements; and

(7) A hearing is ordered to determine the extent of Defendant's damages and said hearing shall be held on April 29, 1987, at 9:30 A.M., in Courtroom B, United States Post Office and Federal Courthouse Building, Erie, Pennsylvania.