**In re GUTERL SPECIAL STEEL CORPORATION, Guterl Steel Corp., Debtors.**

**No. 82–22590 BM, 82–22591 BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 1, 2004.

Guterl Steel Corporation, Pittsburgh, PA, pro se debtor.

Sally E. Edison, McGuire Woods LLP, Stanley G. Makoroff, Blumling & Gusky, L.L.P., Pittsburgh, PA, for Stanley G. Makoroff, trustee.

Kathleen Robb on behalf of United States Trustee, Office of United States Trustee, Pittsburgh, PA, for U.S. Trustee.

Edward J. Laubach, Jr., IRS–Chief Counsel, John L. Laubach, Pittsburgh, PA, for Guterl Steel Corp.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Numerous matters in these cases are ready for decision at this time.

United States Economic Development Administration ("EDA") has brought a motion requesting reconsideration of an order issued on May 21, 2004. The order awarded the law firm Sable, Makoroff & Gusky ("SMG") compensation and reimbursement of expenses for services rendered over an

extended period of time. Another portion of the same order awarded the individual who served first as chapter 11 trustee and then as chapter 7 trustee compensation and reimbursement of expenses for services rendered over an extended period of time. EDA has requested reconsideration of both portions of the order.

EDA's motion for reconsideration will be denied subject to one exception. The compensation awarded to SMG will be reduced from $232,131.88 to $180,591.35.

Several law firms other than SMG that have served as counsel to the chapter 7 trustee at various times have filed applications for compensation and reimbursement of expenses. The chapter 7 trustee also has filed a second application requesting additional compensation not included in his earlier application.

Utilizing some of the arguments it raised in requesting reconsideration of the order of May 21, 2004, EDA also has objected to these applications. The applications will be granted.

Finally, the chapter 7 trustee has brought an omnibus motion for permission to abandon a portion of real property owned by debtor Guterl Specialty Steel Corporation ("GSSC"). He further requests permission to distribute funds in the court registry that are subject to EDA's mortgage lien and to have these cases closed.

New York State Department of Environmental Conservation ("NYSDEC") opposes the trustee's motion to abandon. It also has brought a cross-motion for an order directing the chapter 7 trustee to pursue EDA and to have EDA disgorge proceeds it received twenty years ago from the sale of another portion of the real property owned by debtor GSSC. Alternatively, NYSDEC requests permission to pursue the disgorgement matter itself.

The chapter 7 trustee's omnibus motion will be granted in its entirety while the cross-motion of NYSDEC will be denied.

—FACTS—

Guterl Steel Corporation ("Guterl") and GSSC are related entities. Guterl was the owner of record some years ago of all the stock of GSSC, which processed and manufactured specialty steel products. It has no other assets.

The assets of GSSC consisted primarily of real property, buildings, machinery and equipment located in Lockport, New York. The real property was comprised of approximately seventy acres of land suited for industrial use.

Simonds Steel & Saw Co. ("Simonds") previously owned the property. Between 1948 and 1956, Simonds processed enriched uranium and thorium, both highly radioactive metals, for the federal government. The work was performed under contract with the United States Atomic Energy Commission ("AEC") in connection with the development of atomic and nuclear weapons during the decade following World War II. The contracts called for AEC to retain possession and control of all radioactive products and waste generated at the site. The work performed by Simonds resulted in the release of detectable quantities of radioactive and chemical waste which contaminated the site. A substantial portion of this radioactive contamination has been remediated during the course of this bankruptcy filing, leaving a lesser amount to be dealt with so as to leave the site contamination-free

AEC was succeeded by United States Department of Energy ("DOE"), which by law acquired all of AEC's rights, responsibilities and liabilities. Included among its rights and responsibilities are possession and control of all radioactive waste at the

site and the responsibility for cleaning up the radioactive contamination left behind.

Debtors filed voluntary chapter 11 petitions on August 4, 1982, more than twenty-two years ago. Their cases were substantively consolidated at a later time. The law firm Lampl, Sable & Makoroff ("LSM") was appointed as counsel to debtors shortly after the petitions were filed. GSSC continued operating its facility as debtor-in-possession until November of 1983.

Subsequent to the commencement of the chapter 11 proceedings, Marine Midland Bank assigned a portion of its mortgage and security interest in GSSC's property to EDA while Southern Mortgage Investors assigned a portion of its mortgage and security interest in the same property to United States Farmers Home Administration ("FHA"). EDA thereafter was designated to act as agent in these cases for Marine Midland Bank, Southern Investors Mortgage Company and FHA.

EDA requested relief from stay in 1983 so it could foreclose on the above realty. It agreed in a letter dated October 28, 1983, to hold its motion in abeyance pending a public sale of the property and payment at the closing of all undisputed portions of the proceeds to EDA. It objected, however, to payment of any counsel fees to LSM as counsel to debtor and to payment of any other professional fees or expenses from its collateral. EDA nonetheless consented to a carve-out in the amount of $100,000 from the sale proceeds from which all claims for professional fees and expenses would be paid. Counsel to debtor accepted these terms in a letter to EDA dated November 1, 1983.

The court entered an order on November 1, 1983, directing GSSC to liquidate its assets in accordance with the terms of the agreement expressed in the letters of October 28, 1983, and November 1, 1983.

The agreement pertaining to payment of professional fees from the sale proceeds was incorporated into the order.

A public sale of GSSC's property was held on March 27, 1984. Allegheny Ludlum Steel Corporation ("ALSC") was the highest bidder with an offer in the amount of $9,517,000. An order confirming the sale to ALSC issued the same day.

On May 30, 1984, the court appointed Stanley Makoroff as chapter 11 trustee. Debtor's officers and directors had all resigned after the sale to ALSC was approved and no one remained to consummate the sale on behalf of debtor GSSC. LSM, which until then had been serving as counsel to debtor, shortly thereafter was appointed as counsel to the chapter 11 trustee. No objection was raised and no appeal followed that appointment.

The closing initially was scheduled to take place on May 30, 1984. Before the closing took place, however, it was discovered that 9.1 acres of the property was contaminated with radioactive waste left from when Simonds Steel processed uranium and thorium metals under the aegis of the AEC. The remaining sixty-one acres or so were not contaminated.

Upon learning of the radioactive contamination, ALSC balked at closing on the transaction and eventually sought to rescind the agreement of sale. An order vacating the sale issued on July 12, 1984.

With the consent of EDA and the chapter 11 trustee, ALSC submitted an application to the City of Lockport to subdivide the 9.1 acres of contaminated land from the remaining sixty-one acres that were free of contamination. The City of Lockport eventually approved the subdivision.

A consent order subsequently issued modifying the terms of the above agreement of sale. The order provided that

ALSC would not purchase the radioactively contaminated portion of the property; it would purchase only the sixty-one acres that were not contaminated. The original purchase price was not modified or reduced.

Based on this modification, the closing took place on August 16, 1984. Of the $9,498,960 realized from the closing, the sum of $8,758,962.06 was paid to EDA at that time. A total of $1,064,974.49 was deposited into the court registry pending further order of court. An additional $44,210.45 not subject to the secured interest of EDA also was deposited in the court registry at various times. These funds, which continue to accrue interest, remain to date in the registry.

Pursuant to the terms of the order of November 1, 1983, professional fees and costs and expenses totaling $100,000 were also paid from the sale proceeds on December 3, 1985. LSM received $55,050 as its *pro rata* share of these funds.

On June 27, 1990, when it became obvious that debtors would not be able to successfully reorganize, their cases were converted to chapter 7 proceedings. Because of his familiarity with the vagaries of the cases, the chapter 11 trustee remained in place as chapter 7 trustee. Sable, Makoroff & Gusky ("SMG"), successor law firm to LSM, was appointed as counsel to the chapter 7 trustee on March 18, 1996.

On March 15, 1996, the chapter 7 trustee brought an omnibus motion to abandon the radioactively contaminated 9.1 acres of property, to distribute all funds remaining in the court registry, and to close these cases. NYSDEC brought a cross-motion to require United States Environmental Protection Agency ("EPA") to clean up the site.

A memorandum opinion and order issued on July 1, 1996, after an extensive evidentiary hearing. EPA was directed to remediate the site "forthwith". If EPA failed to do so, the chapter 7 trustee was authorized to do so himself. The cost of remediation was to be treated as an administrative expense pursuant to § 506(c) of the Bankruptcy Code and was to be paid from funds remaining in the court registry. Should those funds not be sufficient, we indicated a willingness to consider whether EDA should be required to disgorge funds previously paid to it at the closing in August of 1984 to pay for remediation. Finally, the chapter 7 trustee's request to abandon the contaminated portion of the property, to make distribution to creditors from the funds in the court registry and to close these cases was denied.

After much judicial prodding and the utilization of administrative legal time, the USA finally agreed to take steps to partially remediate the site. This prodding culminated when EPA paid to have numerous drums containing hazardous chemicals, some of which were leaking, removed from the site. It did nothing, however, about the radioactive contamination and claimed that cleaning it up was the responsibility of DOE as successor to AEC, under whose auspices Simonds Steel had contaminated the site with radioactive waste.

Various federal agencies have tossed responsibility for cleaning up the site back and forth as though it were a hot potato. Each agency has claimed that another agency has responsibility for cleaning up the site or that funding to do so was the bailiwick of some other federal agency. NYSDEC claims that it lacks funds to pay for remediation.

As for the chapter 7 trustee, he too lacks sufficient funds with which to pay for cleaning up the radioactive contamination. A representative of EPA represented in this court in July of 2000 that it would cost

upwards of $17,000,000 to completely clean up the radioactive contamination. It would be reasonable to infer that with the passing of four years the cost of cleaning it up would not be less than this amount.

The chapter 7 trustee has at his disposal nowhere near this amount. Approximately $1,600,000 remains at this time in the court registry. Even if EDA were to disgorge the funds previously distributed to it—i.e., $8,758,792.06—there would be a shortfall of $7,000,000 or more.

Although the professionals have continued to utilize legal time in pursuing remediation, nothing substantive has happened in these case in the past eight years to bring them to a conclusion. The status of these cases is essentially unchanged from what it was in 1996. Everyone is waiting for one federal agency or another to step forward and provide the funds required to clean up the site. While we recognize that the speed at which federal agencies act often is glacial at best, impatience has set in.

SMG ceased doing business as a law firm on December 31, 1998. The law firm Blumling & Gusky ("BG") was appointed as successor counsel to the chapter 7 trustee on April 26, 1999.

On February 24, 2004, the trustee and SMG filed a motion pursuant to § 506(c) of the Bankruptcy Code requesting payment of compensation and reimbursement of expenses. SMG requested compensation in the amount of $232,131.88[1] and payment of expenses in the amount of $10,836.63 for the period from August 2, 1982, through December 13, 1998. The trustee requested compensation for his services as chapter 11 trustee and then as chapter 7 trustee in the amount of

$132,756.69 and payment of expenses in the amount of $2,149.55 for the period from May 27, 1988, through December 31, 1998.

On February 24, 2004, BG submitted an application for compensation in the amount of $10,676.50 and payment of expenses in the amount of $32.58 for the period from April 1, 1999, through December 31, 2003.

A hearing on these applications was held on May 21, 2004. Notice of the hearing was sent to all creditors and to the assistant United States attorney who previously had appeared on behalf of EDA. An order issued that same day granting the applications of SMG and the trustee. The order was not entered on the docket until the next business day on May 24, 2004.

EDA neither filed an objection to the applications nor appeared at the hearing to state its position concerning the applications.

The court inadvertently failed to issue an order concerning the application of BG for compensation and payment of its expenses. The matter was scheduled for hearing at the same time as the applications of SMG and the trustee. On May 26, 2004, BG filed a motion asking the court to rectify the matter by issuing an order approving its application.

EDA brought a motion on June 2, 2004, requesting reconsideration of the order issued on May 21, 2004.

That same day—i.e., on June 2, 2004,—an attorney from the United States Department of Justice, Civil Division, entered his appearance as counsel to EDA. Said counsel joined an assistant United States

---

1. The total amount of compensation requested by SMG in its application was $287,181.88. The payment in the amount of $55,050 it had received in December of 1985 pursuant to an order of court as its *pro rate* share of the $100,000 carve-out consented to by EDA in November of 1983 was deducted from the requested amount, leaving a total of $232,131.88.

attorney who previously had appeared on behalf of EDA in these cases. The motion for reconsideration was signed by the assistant United States attorney as well as the attorney from the Civil Division of the Department of Justice.

The motions continued rolling in unabated. On June 25, 2004, the chapter 7 trustee brought a motion pursuant to § 506(c) of the Bankruptcy Code for additional compensation in the amount of $2,808.00 for the period from May 3, 2004, through June 25, 2004.

The chapter 7 trustee brought a motion that same day to appoint the law firm McGuireWoods *nunc pro tunc* as of May 21, 2004, as his counsel in place of BG. An order granting the motion was issued that same day.

Finally, the chapter 7 trustee filed an omnibus motion on June 25, 2004, requesting permission to abandon the radioactively contaminated 9.1 acres which the federal government so far has refused to clean up; to utilize the funds remaining in the court registry to pay outstanding fee applications and to distribute the remainder to EDA; and to close debtors' bankruptcy cases more than twenty-two years after they were commenced.

Not wanting to be left in the lurch should the chapter 7 trustee's omnibus motion be granted, McGuireWoods filed an application on July 8, 2004, requesting compensation in the amount of $18,477.50 and payment of expenses in the amount of $510.85. The period covered by its application was from May 21, 2004, to July 8, 2004.

NYSDEC filed a cross-motion on July 15, 2004, in opposition to the chapter 7 trustee's omnibus motion. NYSDEC requested an order directing the chapter 7 trustee to seek to require EDA to disgorge funds previously paid to it at the closing on

August 16, 1984. Alternatively, NYSDEC requested permission to act in the chapter 7 trustee's stead should the chapter 7 trustee fail to pursue the matter against EDA.

In its response to the chapter 7 trustee's omnibus motion, EDA did not object to the trustee's motion to abandon the radioactively contaminated portion of GSSC's property. It did object, however, to the trustee's request to utilize funds in the court registry to pay outstanding fee applications. The entire amount in the registry, EDA insisted, should be paid over to it.

A hearing was held on July 22, 2004, on: (1) EDA's motion for reconsideration; (2) the application of BG for compensation and payment of expenses for its representation of the chapter 7 trustee; (3) the application by the chapter 7 trustee for additional compensation; (4) the application of McGuireWoods for payment of compensation and expenses; (5) the chapter 7 trustee's omnibus motion; and (6) the cross-motion by NYSDEC.

—DISCUSSION—

—I—

### Motion To Reconsider Order of May 21, 2004

EDA has presented a number of arguments in support of its motion for reconsideration of the order of May 21, 2004.

### (1) Did EDA Have Notice of the Fee Applications and the Hearing Thereon?

 Counsel to EDA asserted for the first time at the hearing on its motion for reconsideration that he had not received notice of the fee applications and of the hearing on the applications scheduled for May 21, 2004. By this we understand EDA to assert that it was deprived of

procedural due process. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

This argument is without merit. EDA in our estimation was not deprived of due process.

To begin with, counsel to EDA who argued the motion on behalf of EDA did not enter his appearance in the cases until June 2, 2004, well *after* the motions were scheduled and decided. It stands to reason that notice of the fee applications and of the hearing on the applications was not served upon him.

Moreover, the record reveals that notice was sent to the assistant United States attorney who at the time was counsel of record for EDA. Said attorney of record for EDA unquestionably had notice of the fee applications and hearing and had an opportunity to be heard. Failure of the latter to forward the notices to new counsel to EDA, assuming that is what happened, does not support the conclusion that EDA was deprived of due process.

**(2) Should The Applications Have Been Brought As An Adversary Action?**

■ In their fee applications, SMG and the chapter 7 trustee sought an order pursuant to § 506(c) of the Bankruptcy Code directing the clerk to disburse funds in the court registry to pay the amounts requested. The matter was brought as a contested matter rather than as an adversary action.

EDA asserts that the order of May 21, 2004, was erroneous as a matter of law. According to EDA, the applications by the trustee and SMG amount to an attempt to recover property belonging to EDA as a secured creditor and, as such, should have been brought as an adversary action in accordance with Federal Rule of Bankruptcy Procedure 7001(1). *In re Blaisure,* 150 B.R. 343, 344 (Bankr.M.D.Pa.1992).

■ This argument is without merit. The requirement that a matter brought pursuant to § 506(c) be in the form of an adversary action is not a *per se* rule. A matter that was incorrectly brought as a contested matter when it should have been brought as an adversary action nonetheless may proceed as originally filed if the party against whom it was brought has suffered no prejudice as a consequence. *In re Orfa Corp.,* 170 B.R. 257, 275 (E.D.Pa.1994).

EDA has not alleged that its suffered any prejudice to its rights because the application to pay SMG and the trustee should have been brought as an adversary action instead of as a contested matter. In our estimation, EDA suffered no such prejudice.

Had EDA bothered to appear at the hearing on the applications and insisted that they be rescheduled at a later time as a full-blown evidentiary hearing, it most likely would have had its way. As we have noted, EDA had reasonable notice of the May 21, 2004, hearing and had a reasonable opportunity to appear and raise this objection but did not do so for reasons that are not apparent from the record.[2]

**(3) Is SMG's Application Barred In Part By The Order of November 1, 1983?**

■ On October 28, 1983, an assistant United States attorney representing EDA at the time sent a letter to counsel to

---

**2.** EDA's additional argument that the matter also falls within the scope of Federal Rule of Bankruptcy Procedure 7001(2) and therefore should have been brought as an adversary action fails for the same reasons as does its assertion that the matter falls within the scope of Federal Rule of Bankruptcy Procedure 7001(1).

debtors proposing that EDA would consent to creation of a fund in the amount of $100,000 from the proceeds of the sale of GSSC's property to ALSC with which to pay fees and expenses of any professionals in the case who provided services to the bankruptcy estates. Counsel to debtor consented to the proposal on November 1, 1983. The order of November 1, 1983, directing GSSC to sell its realty at a public sale incorporated this agreement.

LSM, which had been counsel to debtors until the chapter 11 trustee was appointed on May 30, 1984, was appointed as counsel to the chapter 11 trustee shortly thereafter. On May 20, 1985, it submitted a fee application requesting compensation in the amount of $104,910.00 and reimbursement of expenses in the amount of $1,600.53. LSM, predecessor to SMG, was awarded the sum of $55,050.00 as its *pro rata* share of the $100,000 fund created pursuant to the order of November 1, 1983. The remaining $49,860.00 in requested compensation and reimbursement of expenses in the amount of $1,680.53 was not paid to LSM when distribution of the carve-out occurred.

Our review of SMG's application of February 20, 2004, reveals that SMG now seeks payment of the remaining $49,860.00 in compensation and payment of expenses in the amount of $1,680.53 it did not receive the first time around as a result of the order of December 3, 1985. The amount it now seeks to receive that it was not permitted to receive then totals $ 51,540.53 ($49,860.00 + $1,680.53 = $51,540.53).

EDA asserts in its motion for reconsideration that SMG is barred by the order of November 1, 1983, from now receiving $51,540.53 that it did not receive in its original fee application. We agree.

SMG should not have been awarded this amount by the order of May 21, 2004. The parties amicably resolved this question. That amicable resolution should and will be enforced. The order of that date therefore must be modified to reduce the total amount awarded to SMG by $51,540.53 from $232,131.88 to $180,591.35 ($232,-131.88—$51,540.53 = $180,591.35).

### (4) Are The Requirements Of § 506(c) Satisfied Here?

In their application submitted on February 20, 2004, SMG and the trustee cited to § 506(c) of the Bankruptcy Code as authority for utilizing funds in the court registry that are subject to EDA's secured interest to pay their requested compensation and expenses. All but approximately $55,000 of those funds is subject to EDA's mortgage.

EDA asserts that awarding fees and expenses to SMG and the trustee on the basis of § 506(c) was erroneous as a matter of law. Neither requirement of § 506(c), EDA maintains, was satisfied in this instance. This assertion is without merit.

■ Post-petition administrative expenses ordinarily may not be charged against the collateral of a secured creditor. *Precision Steel Shearing, Inc. v. Fremont Financial Corp. (In re Visual Industries, Inc.)*, 57 F.3d 321, 324 (3d Cir.1995). Such expenses normally are charged only against *un*encumbered estate assets. Collateral securing a debt is thereby preserved for the benefit of the secured creditor. *Id.*

■ An exception to this rule was recognized under the common law, however, when a debtor-in-possession or a trustee expended funds to preserve or dispose of collateral securing a debt. *Id.*, 57 F.3d at 324–25. When such an expenditure inured to the benefit of a secured creditor, the claimant was permitted to recover under

the common law principle that the secured creditor otherwise would be unjustly enriched at the expense of the claimant. *Id.,* 57 F.3d at 325.

■ The burden of proof lies with the party seeking payment pursuant to § 506(c). *In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 77 (2d Cir.1984).

■ To recover under § 506(c), a claimant must demonstrate that: (1) the expenditures were reasonable and necessary to the preservation or disposal of the collateral; and (2) the expenditures provided a *direct* benefit to the secured creditor. *Id.* Merely providing some benefit to the secured creditor does not suffice for the satisfaction of the second of these requirements. *Id.,* 57 F.3d at 327. Situations in which a claimant may prevail by virtue of § 506(c) are "sharply limited". *In re Visual Industries,* 57 F.3d at 325.

Having said all of this, it remains to be determined whether the above requirements of § 506(c) were satisfied by the chapter 7 trustee and his counsel.

GSSC's real property initially was sold to ALSC at a public auction on March 27, 1984. As was noted previously, the closing occurred after protracted negotiations on August 16, 1984, when the radioactively contaminated 9.1–acre portion of the property was subdivided from the remainder of the property.

■ EDA maintains that any fees and expenses requested by SMG and the trustee *after* the closing took place on August 16, 1984, do not satisfy the first of the above requirements of § 506(c). They do not relate to the preservation or disposition of its collateral, EDA argues, because the property was disposed of on that date. They instead relate to "ordinary" administrative expenses and, as such, do not fall within the scope of § 506(c). As support

for this latter point, EDA cites to *In re C.S. Associates,* 29 F.3d at 907.

This assertion is totally devoid of merit. It simply does not follow from the undeniable proposition that the closing took place on August 16, 1984, that any action undertaken thereafter by SMG or the trustee amounts to only an "ordinary" administrative expense. ALSC, we have noted, eventually acquired title to only sixty-one acres of the property. The remaining 9.1 acres were not acquired by ALSC because they were radioactively contaminated and to date remain unsold.

It is indisputable that no one would be willing to purchase the remaining 9.1 acres in their present condition. They will have to be decontaminated first.

Virtually all of the activities of the trustee and SMG since the closing occurred on August 16, 1984, have been devoted to prevailing upon one federal agency or another to pay for cleaning up this portion of the property. After much court and administrative time was utilized a federal agency finally agreed to pay for a partial remediation. As such, their efforts qualify as reasonable costs and expenses necessary to the disposal of EDA's collateral. The first of the requirements of § 506(c) is, in other words, satisfied in this instance.

■ EDA's argument that the second prong of § 506(c) also is not satisfied in this instance does not fare any better. EDA contends that it derived no benefit with respect to its collateral except for the actions and expenditures of the trustee and SMG which led to the sale of the property to ALSC and to the closing that occurred in August of 1984.

Any actions undertaken or expenditures incurred thereafter, EDA continues, cannot be said to have been for the purpose of protecting or disposing of its collateral because it already had been disposed in Au-

gust of 1984. They were merely "ordinary" administrative expenses and, as such, are not recoverable under § 506(c) of the Bankruptcy Code.

The flaw in this reasoning is the same as for the argument that the first of the requirements of § 506(c) was not satisfied. We therefore need not repeat it here.

A far more difficult question is whether, in light of the inability of the trustee and his counsel to find a purchaser for the remaining 9.1 acres, the actions and expenses of the trustee and his counsel have conferred any benefit on EDA, let alone a direct benefit. Although EDA does not seem to raise this issue, it should be addressed here.

The inability of the trustee and his counsel to find a purchaser for the remaining 9.1 acres was due to the refusal or failure of various federal agencies to step forward and agree to pay for cleaning up the radioactive contamination. Even if EDA were to disgorge the funds it received at the closing in August of 1984, the trustee would not have anywhere near the amount needed to pay for cleaning the site up.

EDA, along with these various federal agencies, is part of a Medusa-like entity comprising the federal government. Each is but a tentacle of the "same governmental entity".

The notion that different federal agencies may be treated as parts of a single entity is not a novel idea in a bankruptcy context. It has been applied in a setoff context for purposes of § 553 of the Bankruptcy Code. *See HAL, Inc. v. U.S.A. (In re HAL, Inc.)*, 196 B.R. 159, 164 (9th Cir. BAP 1996). It also has been applied for purposes of § 106 of the Bankruptcy Code. See *Ossen v. Department of Social Services, State of Connecticut (In re Charter Oak Associates)*, 361 F.3d 760, 772 (2d Cir.2004).

The same notion should apply here in light of the specific facts presented. EDA and the various federal agencies that have balked at paying to clean up the radioactive contamination on the unsold portion of GSSC's property should be treated as parts of the "same governmental entity" known as the United States Government. Although they unquestionably must be treated as separate and distinct entities in most instances, such a distinction should be disregarded here for reasons set forth below.

It would be appropriate to place responsibility for the refusal or failure of various federal agencies to pay to clean up the site on EDA under the theory that EDA and these other federal agencies are a "single governmental entity". Their conduct in this regard, in other words, is ascribable to EDA.

Returning to the issue at hand, it would be inappropriate to conclude that EDA has not directly benefitted from the actions of the trustee and his counsel in attempting to procure funding from a federal agency to pay for cleaning up the radioactive contamination. EDA is estopped from denying that it has directly benefitted from the actions of the trustee and his counsel to have the property cleaned up so that it can be sold to a third party.

■ The estoppel to which we refer is *not* equitable estoppel. To establish equitable estoppel a party must show that another party: (1) intentionally or negligently misrepresented a material fact; (2) knew or had reason to know that the other party would justifiably rely on the misrepresentation; and (3) induced the other party to act to its own detriment. *Baker v. Upper Southampton Township Zoning Hearing Board*, 830 A.2d 600 (Pa.Cmwlth. 2003), *appeal denied*, 849 A.2d 1206 (2004).

■ Quasi-estoppel, which applies here, differs from garden-variety equitable estoppel in that there is no requirement of a change in position in reliance upon another's prior conduct. *See Valentino v. Teamsters Local 469 Pension Fund,* 2000 WL 1879544, *3 (D.N.J.2000). The doctrine, which has its basis in equity, precludes a party from asserting, to another's prejudice, a position that is inconsistent with a previously-held position. *See Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580, 585 (W.D.Pa.1987).

■ The doctrine applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or where he accepted a benefit. *Id.* The "conscience of the court" is repelled by the inconsistency. *Unruh v. Industrial Commission of the State of Arizona,* 81 Ariz. 118, 301 P.2d 1029, 1031 (Sup.Ct.1956).

■ In common parlance, quasi-estoppel translates into the maxim that "one cannot blow both hot and cold". *Erie Telecommunications,* 659 F.Supp. at 585. Put another way, it is but an application of the maxim that "one cannot eat his cake and have it too". *Western Resources, Inc. v. Union Pacific Railroad Co.,* 2002 WL 1462004, *7 (D.Kan.2002).

We conclude from the unique facts presented here that quasi-estoppel applies. EDA therefore is estopped from denying that the efforts of the trustee and his counsel have provided it with a direct benefit.

EDA sat back and relied on the trustee and his counsel to convince one or another federal agency with the funds to do so to pay to clean up the radioactive contamination so that the trustee could find a willing buyer for the site. At no time did EDA take the position that the trustee should not undertake such an effort. To the contrary, it encouraged the effort. The sole intended beneficiary of these efforts was EDA. Any net proceeds realized from such a sale would have been subject to its secured interest.

These actions by the trustee and his counsel were not done gratuitous. The trustee was obligated to undertake them. In undertaking such actions the trustee sought to discharge his obligation to collect and reduce to money property of the bankruptcy estate and to close the estate as expeditiously as was compatible with the best interests of creditors, especially EDA. See 11 U.S.C. § 704(1).

For EDA to now oppose the request of the trustee and his counsel to be paid from EDA's collateral pursuant to § 506(c) of the Bankruptcy Code for their regrettably futile efforts on behalf of EDA to persuade one federal agency or another to pay for the clean up does not square with EDA's willingness to sit back and rely on the trustee and his counsel in this regard.

EDA's objection shocks the court's conscience and is repugnant to what is fair and equitable. EDA cannot "both have its cake and eat it". As a consequence, EDA is estopped from taking the position that the second of the above requirements of § 506(c) has not been satisfied in this instance.

We conclude in light of the foregoing that, with the exception of $51.540.53 which was paid to SMG for its efforts as counsel to the trustee, EDA's motion for reconsideration of the order issued on May 21, 2004, must be denied.

—I—

### Subsequent Applications For Reimbursement

Several professionals whose retention was approved by this court filed applications for compensation and reimbursement

of expenses after the hearing on May 21, 2004. Arguments in favor of the applications and the opposition thereto of EDA were heard on July 22, 2004.

BG, successor to SMG as counsel to the trustee, filed an application requesting compensation in the amount of $10,676.50 and reimbursement of expenses in the amount of $32.58 for the period from January 1, 1999, through March 28, 2004. When the court inadvertently failed to rule on the motion after the hearing on May 21, 2004, BG filed a motion on May 26, 2004, asking the court to rule on its application.

BG filed a supplemental application as counsel to the trustee on June 25, 2004, requesting compensation in the amount of $2,808.00. The period covered by the application was from March 29, 2004, through June 25, 2004.

McGuireWoods, successor to BG as counsel to the trustee, filed an application on July 8, 2004, requesting compensation in the amount of $18,477.50 and reimbursement of expenses in the amount of $510.83. The period covered by the application is May 21, 2004, through July 28, 2004.

As was the case with the applications approved on May 21, 2004, and revisited in this memorandum opinion, authority for the above requested payments is based on § 506(c) of the Bankruptcy Code and would come from the funds in the court registry if approved.

EDA does not object to the amounts requested in the applications. It instead objects to payment from the court registry pursuant to § 506(c). The arguments offered in support of the objection are identical to arguments raised in its motion for reconsideration concerning the failure of applicants to satisfy the requirements of § 506(c).

We have determined that these arguments lack merit and consequently need not recite them again. Said applications therefore will be approved in the amounts requested. Payments of the amounts approved shall be made from the court registry.

—III—

### Trustee's Motion To Abandon, To Make Distribution. And To Close These Cases

The trustee seeks authority: (1) to abandon the unsold and radioactively contaminated 9.1–acre portion of GSSC's real property; (2) to distribute the funds in the court registry; and (3) to close these cases. We will address these matters *seriatim.*

### (1) Motion To Abandon.

More than eight years ago the trustee brought a motion virtually identical to the motion presently on the table. The motion was denied after an evidentiary hearing. *See Guterl Specialty Steel Corp. v. Economic Development Administration (In re Guterl Steel)*, 198 B.R. 128 (Bankr.W.D.Pa. 1996). We determined, among other things, that the property could not be abandoned due to the presence of barrels containing toxic chemicals which posed an imminent threat to public health and safety.

Now that the site has been partially remediated and toxic chemicals have been removed, the trustee once again has requested permission to abandon the 9.1–acre parcel notwithstanding the presence of radioactive contamination. We have already recounted the saga of the trustee in trying to get one federal agency or another to pay to clean up the site.

NYSDEC vigorously opposes abandonment. It has brought its own cross-motion to require the trustee to seek to compel EDA to disgorge the funds it received at

the closing in August of 1984 so that remediation of the site can at least begin. Alternatively, NYSDEC seeks permission to pursue the matter in the trustee's stead.

Section 554 of the Bankruptcy Code provides in part as follows:

(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 554(a).

It is not disputed that, as it now stands, the radioactively contaminated parcel is of no value or benefit to the bankruptcy estate of GSSC. It also is not disputed that abandonment of the property would violate laws of the State of New York designed to protect public health and safety.

Confronted with this quandary, we must determine whether the trustee nonetheless may abandon the property pursuant to § 554(a) of the Bankruptcy Code.

There was no statutory provision prior to enactment of the Bankruptcy Code that specifically authorized abandonment of estate property in a bankruptcy case. A judicially-created doctrine emerged, however, to the effect that abandonment was not permissible when so doing would violate certain federal or state laws. *See Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 500, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986).

Congress was cognizant of this restriction on abandonment when it enacted § 554(a) of the Bankruptcy Code, which preserved the restriction that abandonment was not permissible when so doing would violate certain federal or state laws. *Id.* Congress did not, in other words, give a trustee in bankruptcy *carte blanche* to abandon property merely because the conditions *expressly* stated in § 554(a) are satisfied.

The issue addressed in *Midlantic* was whether § 554(a) authorized a bankruptcy trustee to abandon estate property in contravention of state laws or regulations designed to protect public health and safety. *Id.,* 474 U.S. at 496, 106 S.Ct. at 757.

We are confronted with the same question In this case. The laws of the State of New York that would be violated if the trustee is permitted to abandon the 9.1–acre parcel are designed to protect public health and safety.

The Supreme Court ultimately held in *Midlantic* that § 554(a) does not trump all federal and state laws in every instance. A trustee may not abandon estate property in contravention of a state statute of regulation that is reasonably designed to protect public health and safety from identified hazards. *Id.,* 474 U.S. at 506–07, 106 S.Ct. at 762.

This exception to abandonment set forth at § 554(a) is not all-encompassing; the exception is "narrow". It does not, for instance, "encompass speculative or indeterminate future violation of such laws that may stem from abandonment". Moreover, the power to abandon is not to be "fettered" by laws or regulations not reasonably calculated to protect public health or safety from "imminent and identifiable harm". *Id.,* 474 U.S. at 507 n. 9, 106 S.Ct. at 762 n. 9.

■ This latter qualification has been construed by one member of this court to mean that the *Midlantic* exception to abandonment applies only if the danger to public health and safety is "imminent". *White v. Coon (In re Purco),* 76 B.R. 523, 533 (Bankr.W.D.Pa.1987). We concur. If there is no imminent threat to public or safety, abandonment pursuant to § 554(a) may be permitted even though state laws

or regulations designed to protect public health or safety will be violated as a consequence.

It is worth noting that the Supreme Court arrived at this holding "without reaching the question whether certain state laws may be so onerous as to interfere with the bankruptcy adjudication". *Id.*, 474 U.S. at 507, 106 S.Ct. at 762. This reservation appears to leave open the possibility that abandonment may be permitted where state law, if given primacy, would be sufficiently burdensome to stymie or render nugatory the bankruptcy process itself.

 Applying these precepts to the facts presented here, we conclude that the *Midlantic* exception to § 554(a) does not apply and that the trustee may abandon the property for reasons set forth below.

To begin with, there is no persuasive reason for concluding that the threat to public health and safety posed by the radioactive contamination is imminent.

In an effort to establish that the 9.1–acre site posed an imminent threat to public health and safety, NYSDEC called as an expert witness one of its employees with a baccalaureate degree in environmental engineering who had inspected the site one day prior to the hearing on July 22, 2004. We have two significant problems with the testimony this witness offered.

When asked to explain why she considered the threat posed by radioactive contamination to be imminent, NYSDEC's expert repeatedly stated that the threat was imminent because certain portions of the site were radioactive. NYSDEC's expert. maintained that *any* detectable amount of radioactive contamination, no matter its intensity, *per se* poses an imminent threat to public health and safety.

Such a *per se* principle in our estimation is untenable. It is a commonplace that we are constantly exposed to radiation virtually any place we go. If this *per se* principle were to apply, virtually every site in our environment would pose an imminent threat to public health and safety.

There is a perhaps more cogent reason why we give no weight to the testimony of NYSDEC's expert. When asked what protective gear she wore when inspecting the site, NYSDEC's expert testified that she wore a hard hat and steel-tipped shoes. If the danger was as imminent as NYSDEC's expert would have us believe, we would expect her to have worn a self-contained protective suit similar to what is commonly worn to clean up hazardous spills.

Perhaps recognizing that the testimony of its expert was not persuasive enough for it to prevail on this issue, NYSDEC sent the court an affidavit by another of its employees and a report issued by the U.S. Army Corps of Engineers ("COE") to bolster its position. We will not consider these submissions in deciding this issue because they were submitted *after* the record was closed at the conclusion of the evidentiary hearing on July 22, 2004. Even if we were inclined to consider these submissions, the statements made therein constitute inadmissible hearsay.

Aside from the absence of persuasive evidence that the radioactive contamination at the site posed an imminent threat to public health and safety, there is yet another reason for permitting the trustee to abandon the 9.1–acre site.

These bankruptcy cases were commenced more than twenty-two years ago. Unlike fine wine, they have not improved with age. Virtually all the efforts of the trustee and his counsel since August of 1984 have been spent attempting to persuade one federal agency or another to

fund cleaning up the property so that it may be sold for the benefit of EDA.

These cases have remained open to the present time only because the trustee has not been successful in this endeavor. Aside from distributing the funds remaining in the court registry in accordance with the determinations made earlier in this memorandum opinion, no bankruptcy issues remain. What remains is determining which federal agency finally will agree to pay for cleaning up the site. This is *not* a bankruptcy matter. We do not have the power to compel any agency of the federal government to take such action. We noted previously that in *Midlantic* the Supreme Court appeared to leave open the possibility that abandonment is permissible where rigid adherence to a state law or regulation designed to protect public health and safety was so "onerous" as to interfere with the bankruptcy process itself. *Midlantic*, 474 US. at 507, 106 S.Ct. at 762.

We would have such a situation were the trustee prohibited from abandoning the site and instead were required to persist in the Sisyphean task of persuading some federal agency to pay to clean up the site. A compelling case can be made that such an "onerous" situation occurred long ago. It would not be far-fetched to think that the gridlock of the past twenty years could will continue for many more years, perhaps for decades.

■ A state law or regulation designed to protect public health and safety which, if enforced, would obstruct or prevent expeditious distribution of estate assets is "trumped" by § 554(a) of the Bankruptcy Code. *Borden v. Wells–Fargo Business Credit Co. (In re Smith–Douglass)*, 856 F.2d 12, 15–16 (4th Cir.1988). Requiring strict compliance with state environmental laws in situations such as we have here would derogate the spirit and purpose of the Bankruptcy Code—i.e., the prompt and expeditious administration of estate assets within a *reasonable* period of time. *In re Oklahoma Refining Co.*, 63 B.R. 562, 565–66 (Bankr.W.D.Okla.1986). What would be a reasonable period of time was exceeded in these cases long ago.

Allowing the trustee to abandon the site will not cause irreparable harm to EDA or to NYSDEC. To the contrary, there are other courts with more general jurisdiction that have the authority to provide a just decision in this matter.

Once the site is finally cleaned up, whenever that may be, EDA should be able to enforce its mortgage lien against the property by bringing a foreclosure action.

As for NYSDEC, it should be able to continue its contretemps with various federal agencies concerning which of them will pay to clean up the site. We have no power to resolve that dispute. Considering that the property is located several hundreds of miles away in another state, we would expect a court located near the property to be better suited to resolve the dispute.

We conclude in light of the foregoing considerations that the trustee's motion to abandon the property should be granted.

### (2) Trustee's Motion To Distribute Funds In Court Registry; Cross–Motion by NYSDEC.

The trustee requests permission: (1) to pay the Clerk the sum of $6,904.44 from the court registry for outstanding administrative fees; (2) to make distribution from the court registry to the fee applicants in accordance with determinations made previously in this memorandum opinion; and (3) to distribute what remains thereafter to EDA.

NYSDEC, which opposes the trustee's motion, has brought a cross-motion for an

order directing the trustee to take action against EDA to disgorge the funds it received at the closing in August of 1984 so that cleaning up the site can commence. NYSDEC alternatively seeks permission to pursue the matter in the trustee's place.

Because there are no bankruptcy issues remaining for this court to resolve, we see no good reason to deny the trustee's request to make the above distributions, including to the Clerk of this court. Any amount left over after all of these distributions have been made shall be distributed to EDA.

■■■ As for NYSDEC's cross-motion, we see it as a non-bankruptcy issue that should be decided in some other forum. Who should pay for cleaning up a site that will no longer be part of the estate of a debtor in bankruptcy is not a matter for this court to decide. Property abandoned in accordance with § 554(a) ceases to be property of the bankruptcy estate. It reverts *nunc pro tunc* to the debtor or whoever had the possessory right to the property when the bankruptcy petition was filed, and stands as though no bankruptcy petition was ever filed. *Dewsnup v. Timm (In re Dewsnup)*, 908 F.2d 588, 590 (10th Cir.1990), *aff'd*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

Granting NYSDEC's cross-motion would only prolong cases which have been mired for more than twenty years in a seemingly interminable dispute between NYSDEC and various federal agencies concerning an environmental problem that we have no power to resolve.

We conclude in light of the foregoing that the chapter 7 trustee's motion to distribute the funds in the court registry should be granted and that the cross-motion of NYSDEC concerning disgorgement of funds previously distributed to EDA should be denied.

### (3) Can These Cases Be Closed?

Now that the issue of abandonment and the issue concerning distribution of the funds in the court registry have been resolved, it remains to be determined whether these cases finally may be closed as the trustee has requested.

■■■ The Bankruptcy Code provides that a case *shall* be closed after it has been fully administered and the trustee has been discharged. 11 U.S.C. § 350(a). The express language of this provision mandates closing a case *after* it is fully administered and the trustee is fully discharged. It does not, however, necessarily prohibit closing a case *before* these requirements are fully satisfied. Put another way, full administration and discharge of the trustee are sufficient but not necessary conditions for closing a case.

■■■ What it is for a case to be "fully administered" is not defined in the Bankruptcy Code. Full administration occurs for purposes of § 350(a) when all property of the estate has been distributed and creditors have been paid. *Goswami v. MTC Distributing Co. (In re Goswami)*, 304 B.R. 386, 392 (9th Cir. BAP 2003).

Although the trustee has collected all of the estate's assets and may abandon the 9.1–acre parcel, he has not yet made actual distribution to creditors. The fact that the trustee has not yet made distribution is of no significance here. How to distribute the funds in the court registry has been determined in this memorandum opinion. All that remains for actual distribution to occur is for the trustee to cut and remit the checks in accordance with those determinations.

■■■ A case may be fully administered for purposes of § 350(a) even though certain tasks that are ministerial in nature

remain to be carried out. *Menk v. LaPaglia (In re Menk)*, 241 B.R. 896, 911 (9th Cir. BAP 1999). A task that does not require any legal expertise to perform qualifies as ministerial. *U.S. Trustee v. Porter, Wright, Morris & Arthur (In re J.W. Knapp Co.)*, 930 F.2d 386, 388 (4th Cir.1991).

 Making distributions to creditors in accordance with determinations made in this memorandum opinion is a ministerial task. No legal expertise is required to issue and remit the checks. The task, in other words, is purely ministerial.

The trustee will be discharged after he has distributed the funds in the court registry and has submitted a final report and account. The clerk thereafter shall mark the case "Closed".

An appropriate order shall issue.

### ORDER OF COURT

**AND NOW**, at Pittsburgh this *1st* day of *November*, 2004, in accordance with the foregoing memorandum opinion, it hereby is **ORDERED, ADJUDGED**, and **DECREED** as follows:

(1) the motion by Economic Development Administration for reconsideration of the order of May 21, 2004, be and hereby is **GRANTED IN PART**; the amount of compensation paid to the law firm Sable, Makoroff & Gusky is **Reduced** from $232,131.88 to $180,501.35; the motion is **DENIED** in all other respects;

(2) the application by the law firm Blumling & Gusky for compensation in the amount of $10,676.50 and reimbursement of expenses in the amount of $32.58 for the period from January 1, 1999, through March 28, 2004, be and hereby is **APPROVED**;

(3) the supplemental application by the law firm Blumling & Gusky for compensation in the amount of $2,808.00 for the period from March 29, 2004, through June 25, 2004, be and hereby is **APPROVED**;

(4) the application by the law firm McGuireWoods for compensation in the amount of $18,477.50 and reimbursement of expenses in the amount of $510.83 be and hereby is **APPROVED**;

(5) the chapter 7 trustee's motion to abandon, to make distribution from estate assets and to close these bankruptcy cases be and hereby is **GRANTED**; any amount remaining in the court registry after distribution has been made to the above applicants and to the Clerk of this court **SHALL** be distributed to United States Economic Development Administration; the chapter 7 trustee **SHALL** be discharged after submitting a final report and account and distributing the fund in the court registry; thereafter, the clerk **SHALL** make these cases "Closed"; and

(6) the cross-motion by New York State Department of Environmental Conservation be and hereby is **DENIED**.

It is **SO ORDERED**.